558 So.2d 1106 (1990)
Lola SISTLER and David Sistler
v.
LIBERTY MUTUAL INSURANCE COMPANY.
No. 89-C-1736.
Supreme Court of Louisiana.
March 12, 1990.
*1107 Don M. Arata, John N. Gallaspy, Michael Paduda, Jr., Gallaspy & Paduda, Bogalusa, for applicant.
Bruce J. Borrello, Metairie, for respondent.
COLE, Justice.
The issue is whether evidence supports the trial court's determination that the difference in elevation between the entrance landing and the foyer floor of the Western Sizzlin in Bogalusa created an unreasonable risk of harm to restaurant patrons. The trial court determined the quarry tile, which covers both the landing and the foyer floor, "could give the sense that no change in elevation existed." It concluded the change of elevation combined with its lack of warning created an unreasonable risk of harm. In reaching this conclusion, the trial court found the risk of harm outweighed the utility of the elevation, which was to retard wind-driven rain. On appeal, the appellate court compared the testimony of the parties' experts, applied the risk/utility rule espoused in Entrevia v. Hood, 427 So.2d 1146 (La.1983), and concluded the trial court manifestly erred. Accordingly, it reversed the judgment rendered in favor of plaintiffs and dismissed their petition with prejudice. 544 So.2d 75 (La.App. 1st Cir.1989). Finding no manifest error in the trial court's holding, we reverse the judgment of the court of appeal.

FACTUAL AND PROCEDURAL HISTORY
Plaintiffs, Lola and David Sistler, filed this tort action against Liberty Mutual Insurance Company, the liability insurer of Western Sizzlin in Bogalusa, for the injuries Mrs. Sistler[1] sustained on January 19, 1986, when she tripped while entering the restaurant.
The Sistlers arrived at the steakhouse intending to partake the Sunday noon meal with Mrs. Sistler's sister and brother-in-law, Carmen and Owen Davis. Mr. Sistler opened the outside door to the foyer of the restaurant and stepped aside for his wife to pass. Looking down, he observed her catch the toe of her right shoe on the vertical face of the one inch high elevated portion of the quarry tile floor, located a few inches in front of the one-half inch high extruded aluminum threshold.[2] Without success, Mrs. Sistler attempted to *1108 brake her fall with her arms. As a result, her upper limbs absorbed the impact of her fall.
Immediately after the fall, Mrs. Sistler attempted to rise but Mr. Sistler told her to lie still for a few minutes, on the foyer floor, so they might ascertain whether she had been seriously injured. Afterwards, he helped her rise.
During their meal, Mrs. Sistler began feeling worse. She was shaking and unable to eat. The next morning, she went to Dr. Foret who identified a fracture involving the shoulder. After x-raying her arm and shoulder area and placing her right arm in a sling, he referred her to Dr. Luis F. Matta, the orthopedist who had performed her prior knee replacement operation. Examining the x-rays taken by Dr. Foret, Dr. Matta diagnosed two fractures, a lineal fracture of the body of the scapula and an avulsion fracture of the greater tuberositas.[3] Preferring conservative management to surgery, Dr. Matta directed Mrs. Sistler to keep her right arm in the sling and visit him weekly. He also prescribed pain medication. Nevertheless, the intensity of the pain forced Mrs. Sistler to sleep nights sitting in a chair.
Once Dr. Matta felt migration of the avulsion was no longer possible, he started Mrs. Sistler on rehabilitative exercises. By March 4th, x-rays revealed good position of the bony fragment so he referred her to a physical therapist who continued to treat her through June. Dr. Matta discharged her on May 19th, but directed her to continue her physical therapy at home. By August or September of 1986, the permanent partial disability of her upper right extremity was estimated at 15-25%.
In March, two months after her fall, Mrs. Sistler began experiencing pain in her right leg and back. She told the physical therapist who was treating her shoulder about the pain in her lower extremities and he applied heat treatment to the area. Her pain, however, gradually became worse. Eventually, she visited a chiropractor who treated her with a Tens Unit. By July 15th, six months after the fall at the Western Sizzlin, she returned to Dr. Matta with complaints of back pain. He performed a Patrick's Test to which she tested positive, indicating hip pathology.
X-rays of Mrs. Sistler's lumbosacral spine and pelvis showed elongated pars or first degree spondylolisthesis of the sacrum, a condition which is degenerative in the elderly. Dr. Matta opined that it pre-existed the accident at the steakhouse and he explained it is associated with osteoarthritis or severe degenerative changes of the hip. Superimposed on the arthritic (rheumatoid and degenerative) changes in the hip, Dr. Matta found aseptic necrosis.[4] He believed Mrs. Sistler's January 19, 1986 fall "most likely caused" the aseptic necrosis in her hip.
As both the osteoarthritis and the aseptic necrosis are progressive, Dr. Matta recommended Mrs. Sistler undergo a total hip replacement operation. He performed the operation on August 6th. Afterwards, he considered Mrs. Sistler's permanent partial disability of her lower right extremity (knee and hip) 60%. Without her knee problems, he estimated her hip problems alone would result in 50% permanent partial disability.
The Sistlers filed this strict liability and negligence action against Liberty Mutual on September 31, 1986. They claimed damages for Mrs. Sistler's pain and suffering, medical expenses and disability, and for Mr. Sistler's loss of consortium. Liberty Mutual answered and specifically pled plaintiff's comparative negligence in failing *1109 to observe the area over which she walked, walking in a careless manner, and failing to observe what a reasonable and prudent person would have observed.
The trial court rendered judgment on December 30, 1987, in favor of Lola Sistler and against Liberty Mutual in the amount of $175,256.20, and in favor of David Sistler and against Liberty Mutual in the amount of $25,000.00. It reasoned the face of the elevation at the entranceway created an unreasonable risk of harm to the restaurant's invitees. In support, the court cited Howard's conclusion that the change in elevation created an unreasonable risk of harm. But the court went further, finding it especially created an unreasonable risk of harm to the infirm elderly. Moreover, the court found the use of the same quarry tile on the landing and in the foyer could easily give the sense that no change in elevation existed. The lack of warning and the lack of highlighting of the change of elevation was noted. The court determined remedies to the hazardous condition could easily have been provided without affecting adversely the utility of the entrance to the foyer. As the utility of the elevation was solely to keep out the wind-driven rain, the trial court found its utility paled in the face of the undue risk of harm it caused to others. The trial court, therefore, concluded Liberty Mutual was strictly liable for the plaintiffs' injuries. In addition, the trial court found Liberty Mutual liable for negligence in failing to warn patrons of the dangerous entrance.
Liberty Mutual appealed suspensively and the appellate court reversed. Rather than focusing on the danger created by the flat face of the entranceway's elevation as did the trial court, the court of appeal's decision dwelt upon Liberty Mutual's evidence showing the aluminum threshold did not constitute an unreasonable risk of harm. The court indicated Maxwell had not considered such thresholds "hidden traps" and he had never seen one painted yellow. It further noted Maxwell had not considered the configuration of the sill and the threshold to be in violation of the Standard Building Code. The court of appeal also appeared impressed by Case's testimony that he had no knowledge of anyone else having tripped and fallen since his business operation commenced. After comparing the testimony of Howard and Maxwell, and after considering the testimony of Case and the others, the appellate court concluded the trial court manifestly erred "in finding the threshold at the entrance of the restaurant constituted an unreasonable risk of harm." Due to its finding on liability, the appellate court did not consider Liberty Mutual's arguments on whether Mrs. Sistler was comparatively negligent or on whether the trial court awarded excessive damages. The ruling of the trial court was reversed and plaintiffs' petition dismissed at their cost.
From this adverse judgment, the Sistlers sought writs from this court. We granted certiorari, 551 So.2d 1309 (La.1989), to examine the risk-utility of the elevated portion of the Western Sizzlin's western entranceway and to determine whether the trial court manifestly erred in finding the restaurant strictly liable and negligent.

EVIDENCE
Trial commenced on November 5, 1987. Plaintiffs testified, submitted the deposition of Dr. Matta, called Dennis Howard and Dempsey Allen as expert witnesses, and called Carmen and Owen Davis as rebuttal witnesses. Howard is a safety consultant with Safety Management, Inc. His specialty is assisting his clients in recognizing, evaluating, controlling and eliminating hazards to which their employees or the general public might be exposed. Certified by the Board of Certified Safety Professionals, he received his training on-the-job. His formal education consisted of an associate degree in biological science and a bachelor of science degree in industrial management/marketing.
He testified that when a floor surface has irregularities or
changes in elevations, it creates the opportunity for people to be caught offguard... it has to do with ... their perception of the irregularities and how that's going to affect their locomotion or *1110 walking activity. If the changes in elevation aren't readily apparent, most people don't consistently accommodate those changes unless there's some clue or some perception that it's a threat to them....
The entrance landing and the foyer floor were both red quarry tile. In his opinion, the contrast was not significant enough to be seen consistently. Mrs. Sistler's toe caught the vertical face of the red tile. He declared the color of the tile (or of the aluminum threshold which was located on top of, but a couple of inches behind the vertical face of the tile) was not a warning color which would normally cause a person to look down and perceive the threat. Warning colors are typically shades of yellow. Therefore, from a safety standpoint, Howard found the one inch high elevation change of the entranceway an impediment to safety.[5]
Plaintiffs' concluding witness was Dempsey Allen, city building inspector for Bogalusa. It had been his responsibility to insure the steakhouse was built in conformity with Bogalusa's building code, which is the same as the Standard Building Code. Allen testified he had inspected the Western Sizzlin from the foundation up, but he had paid no particular attention to its outer doors other than to assure they opened. He was aware of the one inch high elevation located slightly in front of the aluminum threshold at the western entrance to the building, but he did not find it in violation of any Bogalusa code requirement.
In its defense, Liberty Mutual called George Case, Nita Varnado, Dr. James T. Williams, Francis D. Sylvest, Richard Averett, and Murvan M. Maxwell.[6] George Case and his wife operate the Western Sizzlin in Bogalusa. He testified that prior to opening the steakhouse, the building was inpected by the City of Bogalusa and the Fire Marshall. Initially, the Fire Marshall cited some violations, but the objections were not in reference to the doorsill's elevated area. After the violations were corrected, the Fire Marshall approved the steakhouse on the day it opened for business, August 3, 1982. Case estimated the steakhouse served nine thousand customers a month. To his knowledge, of the 500,000 customers the steakhouse had served since its opening, Mrs. Sistler was the first patron to fall due to the elevation change at one of the entrances of the building.
Francis D. Sylvest, former Deputy Fire Marshall with the State Fire Marshall's Office, recalled inspecting the Western Sizzlin. The purpose of his inspection was to discover fire or safety hazards. Using a standard form, he checked the portable fire *1111 extinguishers, the electrical and gas system, the extinguishing system, the exit lights, the proper swing and width of the doors, the stairs, etc. His inspection of the steakhouse on August 3, 1982 revealed prior violations had been corrected and there were no present violations.
Murvan M. Maxwell, an architect, fire protection consultant and building code consultant, was Liberty Mutual's concluding witness. Maxwell submitted his curriculum vitae and testified of his practice with the firm of Maxwell and LeBreton Architects in New Orleans. He became a Louisiana registered architect in 1934 and has served as president of the New Orleans Chapter of the American Institute of Architects and as president of the Louisiana Architects Association. He also had been chairman of both the Board of Building Standards and Appeals of the City of New Orleans and the Louisiana State Fire Marshall's Review Board.
Maxwell testified his inspection of the western entranceway of the steakhouse did not reveal any building code violations. He did not find the one inch change in elevation unreasonable. He considered the elevation a very common method of retarding the wind-driven rain from blowing into the premises. The combination of the extruded aluminum threshold and the elevated portion with its bull-nosed tile, forms a water stop and slopes from the wall side to the outside to drain water.
On cross-examination he admitted differences in elevations, especially when both levels are the same color, present a safety problem. He conceded without a break in color, it is possible to create an illusion of only a single level. In his opinion, however, the elevation at the steakhouse's western entrance had a prominent break in color because of the white caulking located at the base of the elevation. (See Appendix.) Thus, the only problem he envisioned the one inch differential in height could cause was to wheelchair operators who might have difficulty getting over the rise. He was not concerned about the possibility of someone catching their toe on the elevation. He had examined instances where people caught their toe on the quarter-inch elevation of an expansion joint in a sidewalk. In his opinion, it was axiomatic the elderly would have more difficulty with the differences in floor elevation than would a younger person.

LEGAL PRECEPTS
A. Appellate Review
Louisiana's three-tiered court system allocates the fact finding function to the trial courts. Virgil v. American Guarantee and Liability Ins. Co., 507 So.2d 825 (La. 1987). Due to that allocation and the trial court's opportunity to evaluate live witnesses or to evaluate a mixture of deposition and live testimony, great deference is accorded to the trial court's factual findings. Id. Where the testimony of expert witnesses differ, it is the responsibility of the trier of fact to determine which evidence is the most credible. Economy Auto Salvage v. Allstate Ins. Co., 499 So.2d 963 (La.App. 3d Cir.1986), writ den., 501 So.2d 199 (La.1986); Thompson v. Tuggle, 486 So.2d 144 (La.App. 3d Cir.1986), writ den., 489 So.2d 919 (La.1986). See Rosell v. Esco, 549 So.2d 840 (La.1989). Consequently, on appellate review the trial court's reasonable factual findings, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed. Virgil, supra.
Absent "manifest error" or unless it is "clearly wrong," the jury or trial court's findings of fact may not be disturbed on appeal. This standard is set forth in Canter v. Koehring Co., 283 So.2d 716, 724 (La.1973), as follows:
When there is evidence before the trier of fact which, upon its reasonable evaluation of credibility, furnishes a reasonable factual basis for the trier of fact's finding, on review the appellate court should not disturb this factual finding in the absence of manifest error ... [W]here there is conflict in testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel its own evaluations *1112 and inferences are as reasonable....
Thus, the appellate court's disagreement with the trial court, alone, is not grounds for substituting its judgment for that of the trier of fact. Borden, Inc. v. Howard Trucking Co., Inc., 454 So.2d 1081 (La.1983). If the trial court or jury's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Rosell, supra. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Id.; Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
B. Theory of Recovery
In an action asserting strict liability as grounds for recovery, the plaintiff bears the burden of proving 1) the thing which caused damages was in the care, custody and control of the defendant; 2) the thing had a vice or defect which created an unreasonable risk of harm; and 3) the injuries were caused by a defect.[7] LSA-C.C. art. 2317; Loescher v. Parr, 324 So.2d 441 (La.1975). These general principles are contained in LSA-C.C. art. 2317, which provides: "We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody. This, however, is to be understood with the following modifications." Succeeding article 2322 then references the modifications applicable to the owner of a building: "The owner of a building is answerable for the damage occasioned by its ruin, when this is caused by neglect to repair it, or when it is the result of a vice in its original construction."
Legal fault, the first element of the plaintiff's case under articles 2317 and 2322, arises out of the legal relationship between the defendant and the person or thing whose conduct or defect creates an unreasonable risk of injuries to others. Loescher, supra; Entrevia v. Hood, 427 So.2d 1146 (La.1983). The fault of the owner is based upon his failure to prevent the building for which he is responsible from causing such an unreasonable risk of injury to others. Id. Rather than the loss falling upon some innocent third person, the loss resulting from the creation of the risk falls upon the person to whom society allots its care, custody or control (guarde). See Id. The rationale is the owner is in a better position than the innocent victim to detect, evaluate and take steps to eliminate an unreasonable risk of harm which arises from the thing. King v. Louviere, 543 So.2d 1327 (La.1989); Ross v. La Coste de Monterville, 502 So.2d 1026 (La.1987).
The second element of strict liability requires the plaintiff prove the vice or defect of the thing is a condition which poses an unreasonable risk of harm to others. Loescher, supra; Entrevia, supra; Crawford, "Torts: Recent Developments in the Law, 1986-1987," 48 La.L.Rev. 507 (1987). The dangerous aspect of the thing must be unreasonable. Entrevia, supra; 48 La.L. Rev. at 508. Reasonableness of the risk is determined by balancing the probability and magnitude of the risk against the utility of the thing. Hunt v. City Stores, Inc., 387 So.2d 585 (La.1980).
The unreasonable risk criterion cannot be applied mechanically. Entrevia, supra; Landry v. State, 495 So.2d 1284 (La. 1986). This criterion is a concept employed to symbolize the judicial process of deciding which risks are encompassed by the codal obligations from the standpoint of *1113 justice and social utility. Id. Reaching an intelligent and responsible decision of whether a risk is unreasonable involves consideration of moral, social and economic values as well as the ideal of justice. Id.
The third element is the causal relationship between the defect and the damages. Thus, to recover in strict liability against an owner of a building the injured person must prove the building, or its appurtenances, "posed an unreasonable risk of harm to others" and that his damage occurred because of the risk.
Upon proof of all three elements of strict liability, the owner is responsible for the damages unless he proves the damages were caused by the fault of the victim, by the fault of a third person, or by an irresistible force. Entrevia, supra.
When a court finds victim fault, comparative fault principles are applied on a case-by-case basis. Landry, supra. Courts applying the victim fault defense inquire whether reducing the negligent plaintiff's recovery would serve as an incentive for similarly situated plaintiffs to exercise care, while not reducing the incentive of the owner of the thing to remove the risk of harm. Id. Reduction of plaintiff's recovery should not diminish the defendant's incentive to remove the unreasonable risk from his property. Id.; 48 La.L. Rev. at 511.

APPLICATION OF PRECEPTS TO FACTS
The trial court found the face of the elevation, where Mrs. Sistler caught the toe of her shoe, created an unreasonable risk of harm to restaurant invitees, especially to those who are infirm or elderly. The court further found the use of the same quarry tile on the landing and in the foyer could easily give the sense that no change in elevation existed. It determined the lack of warning of the elevation change, as well as its lack of highlighting, created a hazardous condition. Moreover, it noted warning of or highlighting the hazardous condition could easily have been provided without affecting adversely the utility of the elevation. And, while the court observed the elevated area was designed to prevent the rain from blowing into the building, it concluded such a utility paled in the face of the undue risk of harm it caused to others. Thus, the trial court found the face of the elevation at the entranceway of the steakhouse, combined with the failure to provide warning of the elevation change, created an unreasonably hazardous condition. It, therefore, held Liberty Mutual strictly liable for plaintiffs' injuries.
Our review of the record, in its entirety, supports the trial court's findings of fact and evaluations of credibility as reasonable and discloses the court of appeal erred in holding the findings were clearly wrong. Plaintiff's expert, Howard, testified the one inch high elevation change between the floor of the foyer and that of the landing was an impediment to safety. In his opinion, changes in elevation create the opportunity for people to be caught offguard. He stated that if the changes in elevation are not readily apparent and people are not warned of change in elevation, most people do not consistently accommodate the elevation changes while walking. Defendant's expert, Maxwell, stated it was axiomatic the elderly would have more difficulty than younger persons with differences in floor elevation.
In the context of the steakhouse, Howard said the red quarry tile, covering both the entrance landing and foyer floor, did not create a significant contrast. No warning colors, the typical warning color being yellow, drew attention to the vertical face of the elevation. He also testified the extruded aluminum threshold located on top of the elevation, a couple of inches behind its vertical rise, did not warn persons to look down.
In contrast to Howell's testimony, Maxwell did not find the one inch change in elevation unreasonable. He considered the elevation a common and reasonable means of retarding the wind from driving rain into the building. He admitted that differences in elevations, especially when both levels are the same color, present a safety problem because it creates an illusion of only a *1114 single level. He opined, however, that the white caulking located at the base of the elevation created a prominent break in the color of the red quarry tile, preventing such an optical illusion.
In its evaluation of the experts' testimony, it is apparent the trial court chose not to adhere to Maxwell's opinion that the caulking at the base of the elevation made a prominent break in color, preventing the optical illusion of only a single level. We find the photographic exhibits on record support the court's conclusion. The use of the same quarry tile on the landing and in the foyer could easily give the sense that no change in elevation existed. Nevertheless, even without the photographic exhibits, we would affirm the trial court's judgment because when there are two permissible views of evidence, a fact finder's choice between them cannot be manifestly wrong or clearly erroneous. Rosell, supra; Arceneaux, supra. Where the testimony of expert witnesses differ, it is the responsibility of the trier of fact to determine which evidence is the most credible. Thompson v. Tuggle, supra.
The change in elevation is located at the entrance of the steakhouse, a passageway for restaurant patrons of all ages and physical conditions. Mrs. Sistler was a restaurant invitee, using the premises as they were intended to be used. She was somewhat familiar with the premises, as she had been to the restaurant on previous occasions. However, she was not a regular patron, or one with an intimate familiarity of the steakhouse's entranceway. While entering its foyer, she was looking ahead instead of down. No signs, warnings or indicators, drew her attention to or notified her to look down or to be wary of the change in elevation.
Case's testimony indicated falls such as the one Mrs. Sistler experienced had slight statistical probability when compared to the number of patrons who have visited the steakhouse without encountering a mishap. Balancing the magnitude of the risk posed against the utility of the elevation, however, substantiates finding the elevation created an unreasonable risk of harm. The steakhouse had a duty to attract Mrs. Sistler's attention to the change in elevation. Placement of warning signs in the entranceway or placement of yellow highlighting on the face of the elevated surface would not have encumbered the utility of the elevation. The failure to take such precautions caused the face of the elevation, where Mrs. Sistler caught the toe of her shoe, to become unreasonably dangerous and results in defendant becoming strictly liable for any consequential damages.[8]
Business establishments, such as the Western Sizzlin, should anticipate that not all of its invitees automatically look down while entering the premises. The cost of preventing future trip and falls by posting warnings at the entranceway is minimal. Moreover, the financial burden resulting from the finding of strict liability creates the incentive to remove the unreasonable risk of harm.
Without specifically finding Mrs. Sistler did not act negligently, the trial court rejected the defense of contributory negligence. The trial court determined this is not an appropriate case for the application of comparative fault because patrons are entitled to presume their entry into the steakhouse can be made safely and patrons should be able to devote their attention to *1115 the steakhouse's attractive surroundings. The court of appeal pretermitted the issue based upon its finding of no liability. Rather than remanding the issue, we reviewed the record and find Mrs. Sistler did not act negligently.
Due to its finding of no liability, the court of appeal also pretermitted defendant's argument on excessive damages. The record confirms, however, that plaintiffs' award of damages is not excessive. As a consequence of her fall, Mrs. Sistler sustained permanent partial disability to her upper right extremity in the amount of 15-25% and to her lower extremities in the amount of 50-60%. Particularly, Mrs. Sistler can no longer raise her arm past a parallel position to the floor. This impediment limits her former daily activities as well as her hobbies. Furthermore, due to hip pain, she can no longer sit for long periods, walk great distances or ride in a car for long distances. Mrs. Sistler's pain, suffering and rehabilitative process have already been chronicled.
The trier of fact did not abuse its much discretion in making the award. Consequently, we affirm the general damage award in favor of Mrs. Sistler in the amount of $175,256.20. Scott v. Hosp. Serv. Dist No. 1, 496 So.2d 270 (La.1986); Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1977). Likewise, we affirm the award to Mr. Sistler for his loss of consortium in the amount of $25,000. As a result of his wife's fall, he was forced into changing his lifestyle which impacted upon their personal relationship. The award in his favor was not excessive or an abuse of discretion.

DECREE
For the reasons assigned, the ruling of the court of appeal is reversed and the judgment of the trial court is reinstated.
COURT OF APPEAL REVERSED; TRIAL COURT JUDGMENT REINSTATED.
*1116 
NOTES
[1] Mrs. Sistler, age 62, had rheumatoid arthritis in her right knee. Because of this non-degenerative form of arthritis, her right knee was totally replaced in July 1985. The operation left her right leg approximately one-half inch shorter than her left leg. In the six months between the knee operation and the accident at the steakhouse, she recovered from the operation and did not need the assistance of a cane. Her automobile, however, continued to display a "handicapped driver" license plate, a plate which she had obtained prior to her knee operation.
[2] There is a one inch difference in elevation between the entrance landing outside the building and the foyer floor within the building. Both are covered with red quarry tile. The elevation is slightly rounded or bull-nosed. A couple of inches beyond the vertical elevation sits a half-inch high extruded aluminum threshold.
[3] The first fracture was a hairline fracture of the shoulder blade and the latter a strain or stress on the ligament. Instead of tearing the ligament, the avulsion pulls a piece of bone or the attachments away from the main part of the bone.
[4] Aseptic necrosis is death of the cells. Dr. Matta testified that Mrs. Sistler had bony aseptic necrosis which is death of bony cells and is usually the result of a vascular necrosis growth, secondary to the lack of circulation. Aseptic necrosis can occur from a number of conditions including excessive use of steroids, kidney dialysis, narcotics, alcoholism, trauma, and trauma with the dislocation of the hip. It can also be idiopathic which means it is of an unknown origin.
[5] Howard stated he found violations of § 508 of the Standard Building Code, which relates to accessibility for the handicapped. Because § 508 specifically referred to American National Standard Institute (ANSI) regulation A-117.1 (1980), Howard inferred that the intent of § 508 was compliance with all of ANSI's standards on accessibility for the physically handicapped. Section 4.5.2 of ANSI A-117.1 provides that changes in ground or floor surface levels greater than one half inch shall be accomplished by a ramp. On cross-examination, however, he clarified that ANSI requirements did not apply to every means of egress to the building and admitted that the ANSI code might not have relevance to this particular accident. He also admitted his on-site examination of the steakhouse was limited to the entranceway where Mrs. Sistler fell.
[6] Varnado, the mother-in-law of Case, had not witnessed Mrs. Sistler's fall but, nevertheless, testified as a fact witness.

Averett testified he and his crew performed the general carpentry construction work for the steakhouse. He constructed its doors, doorsills, transoms, etc., according to the plans furnished to him. He informed the court that the difference in elevation at the entranceway held no significance to him. He testified he was not concerned with ANSI standards.
Dr. James T. Williams, an orthopedic surgeon, was called by the defense to challenge Dr. Matta's conclusions that Mrs. Sistler's hip ailments were related to her fall. Dr. Williams had not examined Mrs. Sistler. From his review of her hip x-rays taken in July of 1986, he determined her hip disease had been present for years. He opined the x-rays showed areas of sclerosis, and increased bone density which he stated is the typical appearance of osteoarthritis. He disagreed with Dr. Matta's conclusion that Mrs. Sistler's fall in January had any relationship to the presence of aseptic necrosis in her hip. He declared a patient would be unable to walk if she had sustained trauma to the hip of sufficient severity to lead to aseptic necrosis.
[7] The plaintiff asserting negligence liability under LSA-C.C. art. 2315, has the same burden plus the additional burden of proving the defendant's scienter, i.e., the defendant knew or should have known of the defect. Kent v. Gulf States Utilities Co., 418 So.2d 493 (La.1982). The defendant's inability to know or prevent the risk is not a defense in a strict liability case but precludes a finding of negligence. Entrevia v. Hood, 427 So.2d 1146 (La.1983); Loescher, supra. The trial court herein found defendant responsible for plaintiffs' damages under both strict liability and negligence theories of recovery. Our determination that defendant is strictly liable, however, pretermits an analysis of whether defendant is also liable for negligence.
[8] The opinion rendered by the court of appeal stated the trial court manifestly erred "in finding the threshold at the entrance of the restaurant constituted an unreasonable risk of harm." The statement indicates a fundamental misunderstanding of the trial court's ruling. According to Webster's dictionary, a "threshold" is "the plank, stone, or piece of timber that lies under the door." Webster's New Collegiate Dictionary, (1981). Neither of the parties' experts, Howard or Maxwell, alluded that the face of the elevation was part of the threshold. Thus, the appellate court's decision dwelt unnecessarily upon evidence showing the extruded aluminum threshold did not constitute an unreasonable risk of harm. In the context of this case, the threshold is only the one-half inch high aluminum strip located on the elevated portion of the foyer floor, a few inches behind the face of the elevated rise. It is the face of the elevated rise which the trial court and this court have determined creates an unreasonable risk of harm to restaurant patrons, not the aluminum strip.