11 WOODARD, Judge.
The plaintiff, Gayle Kimbrell, appeals the trial court’s dismissal of the suit she brought against the defendants, the MacArthur Village Limited Partnership, its managing operator and its premises liability insurer to recover damages for personal injuries she sustained after stepping onto an uneven portion of pavement in the shopping center’s rear lot while working at one of its stores. We affirm.
FACTS
On March 19, 1994, Gayle Kimbrell (Kim-brell) fractured her foot after'stepping off of a drop point from the fire exit door of Amber’s Craft Store (Amber’s), where she worked as a licensed florist in the MacArthur Village Shopping Center, onto an uneven portion of pavement. Kimbrell, who was then forty-six years old, was attempting to transport waste from the store’s rear door to the store’s trash bin, which is located at the back of the shopping center on a blacktop area. Located right outside of the store’s fire exit door is a raised concrete platform which stands twelve inches from the ^ground and contains two descending steps to its left. According to the trial court, “[t]he uneven surface was adjoining the steps attached to the back of the store.”
While carrying a waste basket in a way that blocked her vision, Kimbrell avoided the side concrete steps that led down to the dumpster area and took one big step off of the concrete porch directly onto the point of *605 the lot where.the blacktop portion meets the concrete portion in an uneven manner. Kim* brell alleged in her original petition that “[w]hile on the premises ... [she] slipped and fell and suffered severe disabling injuries” and testified at trial as to how “[a] lot of people tripped on it.” (Emphasis added.) However, on direct examination at trial, she testified that “I stepped down with my left foot and stepped right on that, broke it immediately and went down.” (Emphasis added.) Further, on cross-examination at trial, she reiterated that “when I stepped off the top of the stoop, I took one step with my left foot and right on the hump where it is, period. No walking, no tripping, no broke toe.” (Emphasis added.) The latter account of stepping directly onto the uneven portion of pavement, as opposed to tripping on it, is substantiated by the record.
Kimbrell waited a little while before getting up and walking back into the building to her workstation. She remained at work, but was later unáble to drive her manual-shift ear home that day. .She later sought medical treatment from Dr. William McBride, III (Dr. McBride), a family practitioner, who referred her to Dr. Angela May-eux (Dr. Mayeux), an orthopedic surgeon, who later referred her-to Dr. John Fritehie (Dr. Fritehie), an orthopedic specialist. Kimbrell’s medical treatment, which consisted of prescribed medication, physical therapy and the- use of a walker, took place over a course of ten months. Kimbrell returned to Amber’s doing part-time work on May 12, 1994 and was released to full-time work on July 21, 1994. Kimbrell claims to have rein-jured her foot on February 23, 1995, moving tables at Amber’s. She resigned from her employment at Amber’s on May 18, 1995.
The area in question was used by ■ the employees of Amber’s to take smoke breaks, to paint baskets or displays for the store and to dispose of trash. According to Phillip Beard (Beard), a consulting civil structural engineer, the difference in elevation between the concrete and the asphalt varied from a quarter of an inch to an inch; thus, there was a maximum elevation differential of one inch. It was not proven by a preponderance of the evidence what the condition ■ of the ground was on the. day of the | ¡¡accident, the exact area where Kimbrell stepped, the exact positioning of the dumpster or the path leading to it.
On March 7, 1995, Kimbrell filed suit against MacArthur Village Limited Partnership (MacArthur Village, L.P.), the shopping center’s owner and operator, Maurin-Ogden, its managing partner, and Zurich Insurance Company, its premises liability insurer. Trial was held on this matter on February 28, 1997, and judgment was rendered on July 2, 1997 against Kimbrell, dismissing her suit. This appeal follows.
ASSIGNMENT OF ERROR
Kimbrell. asserts that the trial court erred in:
1. Failing to find that the uneven portion of the pavement presented an unreasonable risk of harm to others.
2. Failing to award her damages commensurate with her injury.
LAW
Unreasonable Risk of Harm
The main issue before us is whether the uneven portion of the pavement was a condition that presented an unreasonable risk of harm to person^ on the premises. An owner of immovable property or its custodian “has a duty to keep such property in a reasonably safe condition” and “must discover any unreasonably dangerous condition on his premises and either correct the condition or' warn potential victims of its existence.” Soileau v. S. Pac. R.R., 93-1064 (La.App. 3 Cir. 4/20/94); 640 So.2d 417, 422. Although the photographs introduced into evidence reveal that the condition of the pavement is not perfect, that imperfection does not make the defendants automatically subject to liability, for not every defect presents an unreasonable risk of harm. See Bennett v. City of Lafayette, 93-1113 (La.App. 3 Cir. 4/6/94); 635 So.2d 515, writ denied, 94-1201 (La.7/1/94); 639 So.2d 1167. Absent manifest error, we will not disturb the trial court’s ultimate determination that the condition did not create an unreasonable.- risk of harm. Rosell. v. ESCO, 549 So.2d 840 (La.1989). *606 See also Reed v. Wal-Mart Stores, Inc., 97-1174 (La.3/4/98); 708 So.2d 362.
|4It is well settled that “[n]ot every minor imperfection or irregularity will give rise to strict liability. The defect must be of such a nature as to constitute a dangerous condition which would reasonably be expected to cause injury to a prudent person using ordinary care under the circumstances.” Koppie v. Commercial Union Ins. Co., 478 So.2d 179, 181 (La.App. 3 Cir.1985) (citations omitted) (emphasis added). For example, in Boyle v. Bd. of Supervisors, Louisiana State Univ., 96-1158 (La.1/14/97); 685 So.2d 1080, the Louisiana Supreme Court held that a one-half to one-inch height variance on a university’s sidewalk did not present an unreasonable danger so that a university could be held strictly liable for a pedestrian’s injuries. Further, the Louisiana Supreme Court recently recognized the following:
It is common for the surfaces of streets, sidewalks, and parking lots to be irregular. It is not the duty of the party having garde of the same to eliminate all variations in elevations existing along the countless cracks, seams, joints, and curbs. These surfaces are not required to be smooth and lacking in deviations, and indeed, such a ■ requirement would be impossible to meet.
Reed, 97-1174, p. 1; 708 So.2d at 363.
Several considerations play a role in the legal concept of what constitutes an unreasonable risk of harm. The first involves a risk-utility balancing test, as set out in Verrett v. Cameron Tel. Co., 417 So.2d 1319, 1325 (La.App. 3 Cir.), writ defied, 422 So.2d 164 (La.1982), where this court weighed such factors as: “(1) the probability of risk occurring, (2) the gravity of the consequences if it does, and (3) the burden of adequate precautions.”
The risk-utility balancing test also involves a consideration of “the voluntariness or deliberateness with which the victim encounters the risk-creating thing.” Verrett, 417 So.2d at 1326. We note at the onset that had Kimbrell used the steps in the manner for which they were normally intended, the accident may not have occurred. The stairs existed so that Amber’s employees could descend onto the back lot to do such things as dispose of trash or paint displays or baskets. According to trial testimony, Section 100.3 of the National Safety Code states that “no controller of a building or environment can totally ensure the safety of any person on the premises or foresee every possible type of accident that can take place.... Each individual who enters into a premises or environment or using a piece of machinery shall behave in a reasonable and safe manner.” (Emphasis added.) Despite having her vision blocked Isby a basket full of trash, Kim-brell, nevertheless, chose to avoid the steps and step directly off of the concrete porch, which was twelve inches high, onto an area that she characterized as dangerous before the incident. She admitted that “I really couldn’t see down with the basket and I stepped down with my left foot and stepped right on that, broke it immediately and went down.” As this court in Bradford v. Consol. Am. Ins. Co., 493 So.2d 895, 898 (La.App. 3 Cir.1986), ruled against a plaintiff who “was not following a beaten path, but was making her own way and choosing her own course across an open grass field[,]” we, too, hold that Kimbrell “should have exercised greater care and caution ...” and also should, have used the steps in the manner for which they were intended. (Emphasis added.)
In addition, Kimbrell was familiar with the condition of the surface. In fact, she admitted at trial that the condition was present for at least two years. According to Michael Harper (Harper), a former Amber’s employee from 1992 to 1995, the condition existed “the whole time that [he] was there[,]” which was from 1992 to 1995. As aptly stated by the trial judge, “[t]he risk of harm to a knowledgeable user choosing to step blindly into an area of known irregularities is not great enough with the present facts to impose a duty on the owner/lessor to correct the deviation.” (Emphasis added.) As in Tupper v. State Farm Fire & Cas. Co., 553 So.2d 488, 491 (La.App. 3 Cir.1989), where a frozen yogurt store patron “admitted that she did not look down when she stepped down” from an elevated platform and injured herself, we find that if Kimbrell “had been exercising ordinary care, this accident would not have happened.”
*607 As for the social utility involved, the court in Summerville v. Louisiana Nursery Outlet, Inc., 95-2224 (La.App. 1 Cir. 6/28/96); 676 So.2d 238, 241, unit denied, 96-1921 (La. 11/1/96); 681 So.2d 1263, held that “the utility of ... parking lots for businesses and shopping is high for today’s mobile society.” We hold that the function of the lot, as with the questioned area in Bradford, 493 So.2d at 899, “militate[s] against finding any duty owed to the plaintiff to protect her from the damages which she sustained.”
Although Kimbrell sustained a ‘fracture to her foot, we cannot say that the probability of risk was great. First, the condition in question was proved to have existed in an area removed from public traffic. Although Beard, the consulting civil structural engineer, asserted that the fire exit door “is something that would have been use by the general public in the event of a problem[,]” when asked to confirm whether [(¡the rear door, in actuality, “would have been of limited use” and “was not one that invited the public to go into or out of Amber’sf,]” he responded, “That’s correct.” Additionally, Ann Armes (Armes), who worked with Kim-brell for about two and a half years, and Earl Swanson, Jr. (Swanson), who was assistant manager at the time of the accident, both testified that the door was not used by the public as an entrance or an exit. Second, the height variance between the two surfaces is from one quarter of an inch to one inch. It is unknown at which variance Kimbrell fell. Therefore, as the supreme court in Boyle, 685 So.2d at 1083, characterized a one-half to one inch variance as a “relatively small depression[,]” we, too, must hold the same in this ease.
Concerning the accident history of the defect, the trial testimony revealed that Amber’s had approximately fifteen to twenty employees in 1994, and' employees would go out the rear door more than once a day. There is insufficient evidence to establish the existence of elevation-related accidents. Beard testified that he was unaware of any other accidents resulting from the difference in elevation. Harper, Kimbrell’s former coworker, denied knowing of any previous problems with the location in question. He admitted that he stumbled on it himself, but never fell. ' More important, in acknowledging that his prior stumblings occurred when he was disposing of trash, Harper remarked: “Now, I’ve stumbled on it myself, you know, carrying a load of boxes and stuff out, you don’t-can’t see the ground, you know. You don’t know where you’re looking and you can forget it’s there and stumble. I’ve done it myself.” In addition, Armes, another former co-worker of Kimbrell’s, testified at her deposition that she was unaware of prior falls due to the elevation, although she later named at trial an individual named “Freddie” as an Amber’s employee who fell after Kimbrell’s incident. Similarly, when Kimbrell was asked at her deposition whether other employees fell, she responded negatively, but later referred, at trial, to a fall following hers! Moreover, Kimbrell worked at Amber’s from 1990 until May of 1995, at least forty hours a week, and before the March 1994 accident, was able to traverse over the area in question without incident.
Kimbrell cites only one case, Sistler v. Liberty Mut. Ins. Co., 558 So.2d 1106 (La. 1990), as analogous to her situation. Although the supreme court found for the restaurant invitee who tripped and fell over a one-inch difference in elevation between the restaurant’s entrance landing outside the building arid the foyer floor within the building, the circumstances of that case are remarkably different from the one at hand. The supreme court’s decision was persuaded by the fact that the entrance landing and |7the foyer floor were covered with the same red quarry tile, thereby creating a sense that there was no change in elevation." In contrast, there is no optical illusion in this case. The overlapping surfaces involved not only different material; but also different colors.Beard admitted that “It?s obvious that there is asphalt which is black and concrete which' is an off-white color.” The blank asphalt created a prominent break in the color of the off-white concrete, thereby preventing the illusion of a single, continuing surface. Beard also admitted that based on photographs 32.7 and 32.8, the blacktop is clearly higher than the concrete. In addition, Armes testified that she noticed the change in elevation between the two surfaces on her *608 own and when asked if it was clearly ldenti-fiable[,]” she responded affirmatively. Because difference in elevation is readily apparent, it should have been easily discoverable.
In addition, the supreme court in Sistler noted that the change in elevation was at the entrance of the steakhouse, which was “a passageway for restaurant patrons of all ages and physical conditions.” Id. at 1114. On the other hand, the area involved in the case at bar was a back entrance to a dumpster. Further, the supreme court pointed out that the plaintiff in Sistler “was not a regular patron, or one with an intimate familiarity of the steakhouse’s entranceway.” Id. In the instant ease, Kimbrell was an employee of Amber’s for three to four years and was not merely walking in a direct path from one place to another, in contrast to Sistler. She stepped off of a concrete porch to take a short cut, at which time she stepped onto the difference in elevation.
It is suggested that the paint colors contained in the July 1994 photographs may have played a part in the March 1994 accident. Although Beard opined that the difference in elevation was masked by paint discoloration, thus creating a “complex field of vision,” that concept is not significant to this case. Kimbrell’s inability to see the difference between the two surfaces was not obscured by a “complex field of vision,” but rather, by the way she held the waste basket. Although she claims that the step was too narrow for her to descend from it, the diagram introduced into evidence shows that it is about thirty-six inches wide. We, thus, conclude that she could have maneuvered down the step with'the basket.
Compounding the evidence against Kim-brell is the fact that she gave an inconsistent account of her accident. First, according to the signed March 19,1994 witness account of Swanson, who was the assistant manager of Amber’s in 1994, as Kimbrell “step[ped] down she twisted her ankle.” There is no mention of any | gdifference in elevation. In contrast, Kimbrell testified at trial that “I never twisted my ankle-” Second, according to the deposition testimony of Dr. McBride, who was the first treating physician, “[Kimbrell] explained to [him] that she had fallen off a step.... Interestingly, Dr. McBride stated that the fracture she sustained was consistent -with the type of fall she described. Third, the deposition testimony of Dr. Mayeux, her second treating physician, revealed that “she had stepped off of a concrete step and twisted her ankle.” Fourth, Beard explained that after interviewing Kimbrell, his “understanding was that ... she turned and encountered the ledge.” In addition, it was not proven at trial which part of the elevation range of a quarter of an inch to an inch Kimbrell encountered. Thus, it cannot be said that the defect caused her fall and resulting injury.
Based upon the record as a whole, we find that the trial court’s conclusions were reasonable. The condition in question did not pose a risk of harm sufficient to create liability on the part of the defendants.
Damages
Since we have held that the condition did not present an unreasonable risk of harm, this issue need not be addressed.
CONCLUSION
For the foregoing reasons, the judgment of the trial court is affirmed. All costs of this appeal are to be borne by Kimbrell.
AFFIRMED.