786 So.2d 682 (2001)
Terry LASYONE
v.
KANSAS CITY SOUTHERN RAILROAD, State of Louisiana through DOTD and the Parish of Pointe Coupee through its Governing Authority, the Police Jury of Pointe Coupee Parish.
No. 2000-C-2628.
Supreme Court of Louisiana.
April 3, 2001.
*685 Walter L. Smith, Craig S. Watson, Baton Rouge, Counsel for Applicant.
*686 Bobby S. Gilliam, Shreveport, Arthur H. Andrews, Kenneth W. Benson, Jr., Baton Rouge, Counsel for Respondent.
KNOLL, Justice.
This case involves a determination of whether the Louisiana Department of Transportation and Development (hereafter "DOTD") should be held liable to a motorist because of the placement of a 90-foot longitudinal guardrail[1] on a road shoulder just before a railroad crossing. In particular, this case involves the collision of an 18 wheel tank truck and a freight train at a single track crossing marked with railroad crossing lights. The appellate court reversed the trial judge's holding that the longitudinal guardrail on the road shoulder posed an unreasonable risk of harm. Accordingly, the appellate court found the motorist totally at fault and reversed the trial judge's assessment of 50 per cent fault to DOTD. Thus, once again this court is faced with a case that strictly calls into question the appropriateness of the appellate court's reversal of a trial judge's decision contrary to the manifest error doctrine. After carefully reviewing the record, we reverse the appellate court, finding no manifest error in the trial judge's adjudication of this matter which found both parties equally at fault.

FACTS AND PROCEDURAL HISTORY
This accident occurred at approximately 6:00 a.m. on October, 20, 1986, as Terry Lasyone (hereafter "Lasyone") drove his tank truck northbound on Louisiana Highway 1 (hereafter "Highway 1") just south of the community of Lettsworth in Pointe Coupee Parish, Louisiana. At the time, Lasyone was transporting a load of 80,000 pounds of asphalt for his employer, James White Trucking.
A single track railroad crosses Highway 1 just south of Lettsworth and generally runs in a north-south direction.[2] It is undisputed that the following warnings preceded the railroad crossing: a yellow warning sign at 825 feet; an additional warning sign at 550 feet; and a RXR sign painted in white on the northbound lane at 550 feet. It was also undisputed that there was a pair of cantilevered signal lights at the railroad crossing, one on each side of the track facing oncoming traffic; each light was located in the clear zone, 11-feet from the edge of Highway 1. Each signal had four flashing lights. It was not seriously disputed that the signal lights were functioning at the time of the accident.[3]
As pertaining to northbound motorists (east of the railroad track), DOTD erected a guardrail 6-feet from the highway's edge which runs from the cantilevered signal light 90 feet on the north shoulder of Highway 1, parallel to the highway; a similar guardrail runs along the south shoulder of Highway 1 across (west of) the railroad track. The guardrail, a metal Wbeam, is attached to 6 by 6 inch creosote wood posts spaced approximately 6-feet *687 apart.[4]
At the point where the railroad crossing and Highway 1 coalesce, the roadway is generally oriented east-west. A 24-inch (diameter) concrete drain crosses beneath the highway and runs basically parallel to the track. This drain begins south of the highway and exits north of the highway beyond the highway shoulder (past the guardrail). The end of the culvert is marked with a striped warning deliminator. The culvert channels water by gravity flow down a sloping embankment into Bayou Lettsworth, a small waterway located well north of Highway 1; because of the topographic layout, the bayou functions as a shallow ditch. A small elevated railroad bridge crosses Bayou Lettsworth north of the highway and an embankment is formed by the raised aggregate earthen work which elevates the track between the bayou and the highway.
As Lasyone came out of a long, sweeping curve in the highway, he failed to notice the railroad crossing and the approaching Kansas City Southern Railway Company (hereafter "KCS") train that was traveling southbound at approximately 40 m.p.h.[5] After twice reducing his speed from 40 m.p.h., Lasyone attempted to take evasive action to avoid the train by maneuvering to the northern (right) side of the highway shoulder. Instead, it is contended by Lasyone that his truck struck the 90-foot long longitudinal guardrail placed on the northern shoulder of the highway which then redirected his tank truck into the path of the train. The cab of Lasyone's truck struck the fifth or sixth rail car behind the train's three leading locomotives; the tank portion of the truck did not contact the train.
Lasyone was thrown from his vehicle to the highway just before the collision destroyed the cab of the truck. Lasyone suffered numerous severe injuries to his left arm, right leg, and both ankles.[6] Subsequently, Lasyone sued KCS, DOTD, and the parish of Pointe Coupee (hereafter "Parish").
On December 21, 1987, the trial judge dismissed the Parish on a motion for summary judgment, finding that it was not contractually obligated to provide and had not provided maintenance or signing services with respect to Highway 1, the railroad, or the intersection. Liberty Mutual Insurance Company (hereafter "Liberty Mutual") intervened in Lasyone's lawsuit, seeking reimbursement of the disability compensation and medical payments it paid to Lasyone pursuant to a policy of worker's compensation insurance that it issued to his employer, James White Trucking. In its intervention, Liberty Mutual alleged that it was owed weekly benefit payments totaling $87,694.49 and medical benefits of $85,543.60.
Just prior to trial, KCS settled with Lasyone and was formally dismissed by court order dated October 1, 1998. Liberty *688 Mutual also settled part of its intervention claim as to KCS and received $22,500.00, thereby reducing Liberty Mutual's claim to $150,738.09. Trial of this matter then proceeded only against DOTD.
The trial judge heard this matter on March 24 and 25, and June 2, 1998. On October 7, 1998, the trial judge rendered judgment finding Lasyone and DOTD each 50 per cent at fault. It awarded damages totaling $2,960,168.60 (reducible by 50 per cent)[7] and recognized Liberty Mutual's intervention in the sum of $150,738.09.
In its written reasons for judgment, the trial court found that Lasyone attempted to take evasive action, but the placement of the longitudinal guardrail directed his truck into the path of the train and deprived him of his only avenue of escape. The trial court held that DOTD breached its duty to protect Lasyone from the unreasonable risk of harm that the placement of the longitudinal guardrail posed to vehicles approaching the railroad crossing. In its assessment of fault to Lasyone, the trial court commented that although the railroad crossing lights were working prior to the collision, Lasyone was "simply inattentive until it was too late."
The appellate court reversed the trial court, finding that Lasyone failed to prove that the guardrail posed an unreasonable risk of harm. Accordingly, it found that Lasyone was solely responsible for this accident. Lasyone v. Kansas City So. R.R., State of Louisiana through DOTD and the Parish of Pointe Coupee through its governing authority, the Police Jury of Pointe Coupee Parish, 99-0735 (La.App. 1 Cir. 6/23/00) (unpublished opinion). We granted Lasyone's writ application to more closely examine the question of manifest error.[8]Lasyone v. State of Louisiana through DOTD, 00-2628 (La.12/8/00), 776 So.2d 457.

STANDARD OF REVIEW
A trial court's finding of fact may not be reversed absent manifest error or unless clearly wrong. Stobart v. State of Louisiana, Through Department of Transportation and Development, 92-1328 (La.4/12/93), 617 So.2d 880. The reviewing court must do more than just simply review the record for some evidence which supports or controverts the trial court's findings; it must instead review the record in its entirety to determine whether the trial court's finding was clearly wrong or manifestly erroneous. Stobart, 617 So.2d at 882. The issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. Id. The reviewing court must always keep in mind that "if the trial court or jury's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." Stobart, 617 So.2d at 882-83, citing Housley v. Cerise, 579 So.2d 973 (La.1991) (quoting Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106, 1112 (La.1990)).
These standards for manifest error review are not new. They are the guiding *689 principles that aid our courts of appeal, which are our error correcting courts, when reviewing a trial court's factual determinations. A manifest error review is applicable to the fact-driven determinations of the present case.

DOTD'S LIABILITY
We must determine whether DOTD was at fault. Under Louisiana law, liability for injuries sustained by one as the result of a defective condition of a thing is based on legal fault, i.e., strict liability. See LA. CIV.CODE ANN. art. 2317.[9] Louisiana's codal provision for legal fault is found in LA. CIV.CODE ANN. art. 2317 which provides:
We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody....
In an action asserting liability under LA. CIV.CODE ANN. art. 2317 before 1996, the plaintiff bore the burden of proving three elements: (1) that the thing which caused the damages was in the care, custody, and control (garde) of the defendant;[10] (2) that the thing had a vice, ruin, or defect that presented an unreasonable risk of harm; and (3) that the vice, ruin, or defect was the cause-in-fact of the plaintiff's damages. LA. CIV.CODE ANN. art. 2317; Sistler, 558 So.2d at 1106; Loescher v. Parr, 324 So.2d 441 (La.1975).[11] To recover, plaintiff *690 bears the burden of proving these elements in the affirmative, and the failure on any one is fatal to the case. We must therefore determine if the appellate court erred in determining that the trial court was clearly wrong in finding DOTD strictly liable for Lasyone's damages.
DOTD's duty is to maintain the public roadways in a condition that is reasonably safe and does not present an unreasonable risk of harm to the motoring public exercising ordinary care and reasonable prudence. LA.REV.STAT. ANN. § 48:21(A); Netecke v. State of Louisiana, through DOTD, 98-1182, 98-1197 (La.10/19/99), 747 So.2d 489; Campbell v. Department of Transp. & Dev., 94-1052 (La.1/17/95), 648 So.2d 898, 901-02; Oster v. Department of Transp. & Dev., 582 So.2d 1285, 1288 (La.1991). DOTD must maintain the shoulders and the area off the shoulders, within its right-of-way, in such a condition that they do not present an unreasonable risk of harm to motorists using the adjacent roadway and to others, such as pedestrians, who are using the area in a reasonably prudent manner. Brown v. Louisiana Indemnity Co., 97-1344 (La.3/4/98), 707 So.2d 1240, 1242; Oster, 582 So.2d at 1289-91. DOTD's duty to maintain safe shoulders encompasses the foreseeable risk that for any number of reasons a motorist might find himself on, or partially on, the shoulder. Graves v. Page, 96-2201 (La.11/7/97), 703 So.2d 566, 572; Rue v. State, Dep't of Highways, 372 So.2d 1197, 1199 (La.1979). This duty extends not only to prudent and attentive drivers, but also to motorists who are slightly exceeding the speed limit or momentarily inattentive. Ledbetter v. State, Through La. Dep't of Transp. & Dev., 502 So.2d 1383, 1387 (La.1987).
This duty, however, does not render DOTD the guarantor for the safety of all the motoring public. Graves, 703 So.2d at 572; Briggs v. Hartford Ins. Co., 532 So.2d 1154, 1156 (La.1988). Further, DOTD is not the insurer for all injuries or damages resulting from any risk posed by obstructions on or defects in the roadway or its appurtenances. Id. Moreover, not every imperfection or irregularity will give rise to liability, but only a condition that could reasonably be expected to cause injury to a prudent person using ordinary care under the circumstances. Entrevia v. Hood, 427 So.2d 1146, 1149 (La.1983). Whether DOTD breached its duty to the public, by knowingly maintaining a defective or unreasonably dangerous roadway, depends on all the facts and circumstances determined on a case by case basis. Campbell, 648 So.2d at 901-02.

Cause-in-fact
In the present case, DOTD contends that Lasyone failed to prove that his injuries were significantly worse because the guardrail was present than had the guardrail not been present. Initially, DOTD argues that Lasyone failed to prove that his tank truck even struck the guardrail. In addition, DOTD, urging inconsistency in testimony, asserts that the expert testimony of Dr. William D. Berg, Lasyone's witness, failed to establish that without the guardrail the collision would not have occurred.
The initial inquiry to determine if a party may be liable under the duty-risk analysis is cause-in-fact. Cay v. State, Dep't of Transp. & Dev., 93-0887 (La.1/14/94), 631 So.2d 393, 395. The plaintiff must prove that the alleged defect *691 in the thing was a cause-in-fact of the plaintiff's harm. Brown, 707 So.2d at 1242; Campbell, 648 So.2d at 902. A party's conduct is a cause-in-fact of the harm if it was a substantial factor in bringing about the harm. Graves, 703 So.2d at 570 (citing FRANK L. MARAIST & THOMAS C. GALLIGAN, LOUISIANA TORT LAW, § 4-3, at 86-88 (1996)); Edwards v. Horstman, 96-1403 (La.2/25/97), 687 So.2d 1007. For example, the act is a cause-infact in bringing about the injury when the harm would not have occurred without it. While a party's conduct does not have to be the sole cause of the harm, it is a necessary antecedent essential to an assessment of liability. Theriot v. Lasseigne, 93-2661 (La.7/5/94), 640 So.2d 1305, 1310; Dixie Drive It Yourself Sys. v. American Bev. Co., 242 La. 471, 137 So.2d 298, 302 (1962). Whether an action is the cause-in-fact of the harm is essentially a factual determination that is usually left for the factfinder. Boykin v. Louisiana Transit Co., 96-1932 (La.3/4/98), 707 So.2d 1225, 1231; Theriot, 640 So.2d at 1310.
We now turn to DOTD's contention that Lasyone failed to prove that his injuries were significantly worse because the guardrail was present than had the guardrail not been present. Simply stated, DOTD contends that Lasyone failed to demonstrate that he would have fared better had he been able to drive down the embankment. In connection with that contention, DOTD urges that Dr. Berg's expert opinion, the sole evidence on point, was so contradictory on this factor that it was not worthy of belief.
Pretermitting for the moment any question of Dr. Berg's credibility, we find that DOTD relies only upon conjecture. To explore the question of whether Lasyone would have suffered serious injuries had he been able to escape to the right misses the point of the cause-in-fact inquiry. Having found a firm factual basis for the trial court's conclusion that Lasyone's truck hit the guardrail and was propelled into the train, the pertinent question is to what extent did DOTD's placement of this longitudinal guardrail have something to do with the injuries that Lasyone suffered. See Roberts v. Benoit, 605 So.2d 1032 (La. 1991); Hill v. Lundin & Associates, Inc., 260 La. 542, 256 So.2d 620, 622 (1972). The evidence is quite clear that the presence of the guardrail indeed "was a substantial factor in bringing about the harm" that Lasyone suffered. Graves, 703 So.2d at 570. Accordingly, we find no manifest error in the trial court's finding that DOTD's placement of this longitudinal guardrail was a cause-in-fact of Lasyone's injuries.
Notwithstanding our resolution of this aspect of the cause-in-fact question, it is important at this juncture that we examine the issue of Dr. Berg's credibility and the role that this determination played in the appellate court decision. It is clear that Dr. Berg wore more than one hat during the long course of this litigation. Originally, KCS engaged him as its expert witness. However, once KCS settled with Lasyone just prior to trial, Lasyone then relied upon Dr. Berg as his expert witness.
Although the appellate court initially depicted Dr. Berg as an individual whose expert opinion might be suspect because he vacillated on the issue of whether the guardrail was a factor in the accident, it relied upon his expert testimony later in the opinion to establish its position that the likelihood of harm was minimal. Nevertheless, it cannot be denied that the trial court was presented evidence of Dr. Berg's differing opinion regarding the importance of the guardrail and whether the guardrail prevented Lasyone from evading the train by maneuvering his truck to the right.
*692 Despite these differing opinions, it is well accepted that the trier of fact is charged with the determination of what credibility it assigns to expert witnesses and then to decide which expert among those testifying that it finds more credible. Mistich v. Volkswagen of Germany, Inc., 95-0939 (La.1/29/96), 666 So.2d 1073. In the present case, it is clear that Dr. Berg's opinions were well grounded in the various federal guidelines and that the differences in some of his testimony may have been attributed to the fact that at least one of his pre-trial depositions was taken while he was vacationing away from his office, where he did not have access to those federal guidelines. Thus, Dr. Berg was reluctant to expound further on the significance of the guardrail at this railroad crossing. As recognized in Mistich, "the responsibility of determining which expert was more credible [is placed] on the trial judge." Mistich, 666 So.2d at 1077.
In the present case, the record shows that the trial court was presented with testimony that had the guardrail not been in place, Lasyone could easily have avoided the train by steering right and that his truck would have been channeled alongside the raised aggregate railroad embankment. Moreover, Lasyone himself stated that he attempted to steer his truck to the right because he thought he could avoid a collision with the train. Dr. Berg opined that under this scenario the tank truck would have still overturned, but Lasyone would not have struck the train. Although DOTD's experts professed opinions that differed from Dr. Berg's, it is nonetheless clear that the trial court's reliance on Dr. Berg's opinions cannot be said to be manifestly erroneous, because his statements were well grounded and reasoned, and did not conflict or contradict any objective evidence.
The trial court also made a factual determination that Lasyone attempted to take evasive action to avoid the train, that during this maneuver the tank truck hit the guardrail and was propelled back into the train, and that the presence of this guardrail deprived Lasyone of his only means of escaping the collision.[12]
Lasyone testified that he attempted to avoid the train by steering his tank truck to the right. He further stated that his tank truck struck the guardrail at a speed of approximately 20 m.p.h. and was propelled back into the train's path. In support of his testimony, he offered into evidence photographs taken just nine days after the accident which clearly show that the guardrail was indented and that the 6 by 6 inch creosote support timber was askew. The expert testimony of Dr. Berg established that the indentation was approximately twenty-two feet from the point where the train would overhang the track and was caused by the truck cab. Because of the truck's low speed at the time of impact, he was not surprised that the guardrail was not demolished. DOTD presented the expert testimony of Dr. Neilon Rowan, an expert in lighting design and accident reconstruction, who first contended that Lasyone's truck never hit the guardrail and then later stated that only the rear wheels of the truck cab struck the guardrail. DOTD also relied upon the expert testimony of Dr. William Fogarty, an accident reconstruction expert originally engaged by KCS. Dr. Fogarty opined that the guardrail would not have remained standing if it had been hit by a *693 tank truck weighing in excess of 80,000 pounds and traveling between 20 and 40 m.p.h. at the time of impact.
When findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact's findings; for only the fact finder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989); Virgil v. American Guarantee & Liability Ins. Co., 507 So.2d 825 (La.1987); Boulos v. Morrison, 503 So.2d 1 (La.1987).
The rule that questions of credibility are for the trier of fact applies to the evaluation of expert testimony, unless the stated reasons of the expert are patently unsound. Lirette v. State Farm Ins. Co., 563 So.2d 850, 853 (La.1990). Credibility determinations, including the evaluation of and resolution of conflicts in expert testimony, are factual issues to be resolved by the trier of fact, which should not be disturbed on appeal in the absence of manifest error. Iseah v. E.A. Conway Memorial Hospital, 591 So.2d 767 (La.App. 2d Cir.1991), writ denied, 595 So.2d 657 (La. 1992).
Applying these standards to the facts before us, we find no manifest error in the trial court's determination that the cab of Lasyone's truck impacted the guardrail prior to striking the KCS train. The photographs corroborate Lasyone's testimony, and the record shows that there was a sufficient basis for the trial court to resolve the experts' conflicting conclusions in favor of Lasyone.

Unreasonable risk of harm
Lasyone contends that the appellate court misapplied the manifest error standard when it reviewed the trial court's determination that DOTD's use of this longitudinal guardrail at this railroad crossing presented an unreasonable risk of harm.
There is no fixed rule for determining whether the thing presents an unreasonable risk of harm. To assist the trier-of-fact, we note that many factors are considered and weighed, including: (1) the claims and interests of the parties; (2) the probability of the risk occurring; (3) the gravity of the consequences; (4) the burden of adequate precautions; (5) individual and societal rights and obligations; and (6) the social utility involved. See Boyle v. Board of Supervisors, L.S.U., 96-1158 (La.1/14/97), 685 So.2d 1080; Langlois v. Allied Chem. Corp., 258 La. 1067, 249 So.2d 133, 140 (1971) ("The activities of man for which he may be liable without acting negligently are to be determined after a study of the law and customs, a balancing of claims and interests, a weighing of the risk and the gravity of harm, and a consideration of individual and societal rights and obligations."); see also King v. Louviere, 543 So.2d 1327, 1328-29 (La. 1989).
The unreasonable risk of harm criterion is not a simple rule of law. Rather, it is a criterion established by this Court to facilitate the judicial process required by our Code. Landry v. State, 495 So.2d 1284, 1287 (La.1986). However, we have cautioned that the trier-of-fact cannot apply the unreasonable risk criterion mechanically. Entrevia, 427 So.2d at 1146; Landry, 495 So.2d at 1284. This criterion is a concept employed to symbolize the judicial process of reaching an intelligent and responsible decision and deciding which risks the codal obligations encompass from the standpoint of justice and social utility. Celestine v. Union Oil Co. of California, 652 So.2d 1299, 1304; Sistler, *694 558 So.2d at 1112; Entrevia, 427 So.2d at 1146.
Further, the fact that an accident occurred because of a vice or defect does not elevate the condition of the thing to that of an unreasonably dangerous defect. See Simeon v. John Doe, d/b/a The Sweet Pepper Grill, 618 So.2d 848 (La. 1993); Shipp v. City of Alexandria, 395 So.2d 727, 729 (La.1981). The vice or defect must be of such a nature as to constitute a dangerous condition that would be reasonably expected to cause injury to a prudent person using ordinary care under the circumstances. Id. When harm results from the defect of a thing that creates an unreasonable risk of harm to others, a person legally responsible under these code articles for the supervision, care, or guardianship of the thing may be held liable for the damages caused. Loescher, 324 So.2d at 446. Liability arises from his legal relationship to the thing, i.e., whether he has custody, care, and control, and his failure to prevent the thing for which he is responsible from causing an unreasonable risk or injury to others. Id.
In Netecke, we stated:
In attempting to define the test, we have described the unreasonable risk of harm criterion as serving as a guide utilized by the decision maker in balancing the likelihood and magnitude of harm against the social utility of the thing. We have cautioned, however, that such a balancing test does not lend itself well to neat, mathematical formulations. Oster, 582 So.2d at 1289. In addition, the decision maker must consider a broad range of social and economic factors, including the cost to the defendant of avoiding the harm, as well as the risk and the social utility of the party's conduct at the time of the accident. Id. In reaching an intelligent and responsible determination, the decision maker must carefully consider all the circumstances surrounding the particular accident under review to determine whether DOTD's legal duty encompassed the risk which caused the plaintiffs injuries and damages and was intended to protect this plaintiff from this type of harm arising in this manner. Oster, 582 So.2d at 1289; Landry, 495 So.2d at 1287; Entrevia, 427 So.2d at 1151 (Lemmon, J., concurring). The imperfection or irregularity must be of such a nature as to constitute a dangerous condition which would reasonably be expected to cause injury to a prudent person using ordinary care under the circumstances. Deville v. State Farm Ins. Co., 617 So.2d 1255, 1257 (La.App. 3 Cir.1993); Bealer v. National Tea Co., 597 So.2d 1242, 1244 (La.App. 3 Cir. 1992).
Netecke, 747 So.2d at 498.
From the outset, we find it necessary to correct the appellate court's appreciation of the law with regard to inattentive motorists. After citing Netecke in its opinion, the appellate court stated that "DOTD's legal duty did not encompass the risk that a tractor-trailer driver would be inattentive and disregard all manner of warning devices such that in a last minute effort to avoid a collision with the train, the driver would utilize the shoulder and subsequently be re-directed into the path of the train." Lasyone, 99-0735, slip op. at 9.
In Netecke, we reiterated jurisprudence, commencing with Rue which was reaffirmed in Ledbetter and Graves, relative to DOTD's duty to inattentive motorists. In particular, we stated:
DOTD's duty to maintain safe shoulders encompasses the foreseeable risk that for any number of reasons a motorist might find himself on, or partially on, the shoulder. This duty extends not *695 only to prudent and attentive drivers, but also to motorists who are slightly exceeding the speed limit or momentarily inattentive.
Netecke, 747 So.2d at 495. (Citations omitted).
Although in Netecke the motorist, who was neither speeding nor inattentive, did not recover against DOTD, we did not abandon this well settled jurisprudence which was first enunciated in Rue. Rather, we were presented with a driver who intentionally steered her vehicle off the highway, across the paved shoulder, and beyond onto the grassy area where she encountered an open culvert clearly marked by a warning deliminator. Against that backdrop, we explored the unreasonable risk of harm criterion by examining the social utility of the culvert, considering the social and economic factors pertinent to the case, and exploring the physical and financial ability of DOTD to maintain the State's highways, shoulders, and rights of way. Only after fully applying the various factors of the unreasonable risk of harm test did we find that DOTD was not liable for the damages the driver suffered. Accordingly, it is clear that Netecke does not stand for the proposition that DOTD does not owe a duty to the inattentive driver. Thus, we proceed to examine Lasyone's contentions.
In the present case, Lasyone argues that the appellate court: (1) failed to acknowledge the AASHTO guidelines and principles enunciated in publications of the Federal Highway Administration; (2) improperly relied on the steepness of the embankment and the presence of the culvert and the ditch as justification for the presence of the longitudinal guardrail; (3) substituted its own social utility and risk/benefit analysis for that of the trial court; (4) relied on a false premise that because trains passed on this crossing only infrequently that the harm caused by the placement of the guardrail at the grade crossing was only minimal; and (5) ignored physical evidence that showed that the guardrail presented a danger to trucks because the facts showed that Lasyone's truck was redirected into the train.
Federal guidelines in general. As provided by Louisiana law:
DOTD shall adopt minimum safety standards with respect to highway and bridge design, construction, and maintenance. These standards shall correlate with and, so far as possible, conform to the system then current as approved by the American Association of State Highway and Transportation Officials. Hereafter the state highway system shall conform to such safety standards.
LA.REV.STAT. ANN. § 48:35.
Heeding those directives, we note that the AASHTO guide cautions:
[I]t cannot be overemphasized that a traffic barrier is itself a hazard. Every effort should be made in the design stage to eliminate the need for traffic barriers.... A traffic barrier should be installed discriminately and only when it is unfeasible to remove the hazardous condition.
GUIDE FOR SELECTING, LOCATING, AND DESIGNING TRAFFIC BARRIERS § 1-B.
Furthermore, all of the experts agreed the Federal Highway Administration's RAILROAD-HIGHWAY GRADE CROSSING HANDBOOK, a compilation of what is contained in the federal regulations, provides the following with regard to the placement of a longitudinal guardrail at a railroad crossing:
A longitudinal guardrail should not be used for traffic control devices at crossings unless the guardrail is otherwise warranted, as for a steep embankment.
RAILROAD-HIGHWAY GRADE CROSSING HANDBOOK 142 (U.S. Dept. of Transportation & *696 Development, Federal Highway Administration, September 1986).
In addition, this handbook further provides:
The cross-section of the highway at grade crossing should be designed to insure that the driver always has some escape route available.
RAILROAD-HIGHWAY GRADE CROSSING HANDBOOK § 5.4 at 128.[13]
Although Dr. Berg, Lasyone's expert, and Dr. Rowan, DOTD's expert, testified at length about the existence of these general principles, a careful reading of the appellate court's decision shows that none of these principles were acknowledged. Even though Dr. Berg and Dr. Rowan disagreed on whether there were exceptions which would have removed this guardrail from the prohibitions enunciated in these federal promulgations, the appellate court decision is void of any discussion of the differing experts' testimonies about these principles and how exactly the trial court was clearly wrong in its appreciation of that testimony.
Justifications for guardrail placement. After recognizing the federal guidelines, DOTD presented the trial court with three justifications to consider in its determination of whether this longitudinal guardrail presented an unreasonable risk of harm. First, DOTD attempted to show that the "steep embankment" exception recognized in the federal guidelines justified the presence of the guardrail.[14] To establish the factual question of the steepness, DOTD presented the testimony of Charles Berthelot, the foreman in charge of grass cutting at the time of this accident. Berthelot initially testified that he remembers that this embankment was steep because the grass crew could not use a tractor to maintain the area; instead, he pointed out that the crew had to use a slope mower (a mower head on the end of a 20-30 foot flexible arm) to cut the grass. He further stated that the area had been reshaped after another train accident occurred in 1989 and that it was not now as deep. However, when Berthelot was shown photographs of the area during cross-examination, he testified that "the embankment... looked different" at the time of the accident than that pictured in this evidence. After he was told that the pictures he examined were taken just nine days after the Lasyone accident, he admitted that the area was pretty much the same now as that depicted in the photographs. DOTD never attempted to rehabilitate this witness and submitted no other witness to testify differently.
Even though Berthelot's credibility was significantly impugned, the appellate court decision made no reference to this fact. It is well recognized that it is the duty of the appellate court to "do more than just simply review the record for some evidence which supports or controverts the trial court's findings; it must instead review the record in its entirety to determine whether the trial court's finding was clearly wrong *697 or manifestly erroneous." Stobart, 617 So.2d at 882.
Not only was it permissible for the trial court to discount the slope theory that DOTD advanced, the evidence further shows no support for the contention that the trial court would have been clearly wrong or manifestly erroneous in its rejection of the ditch as additional justification for the guardrail. It is noteworthy that the ditch that does exist is perpendicular to the highway, not parallel to it, and runs under the roadway via a culvert. Dr. Berg examined the pictures of the area as it existed in 1986 at the time of the accident. He pointed out that there was no ditch as that term is commonly understood because it had no backslope; instead, he basically described this topographic feature as an embankment that simply sloped downward to the bayou. Thus, he stated that there was no backslope to the ditch for an errant vehicle to run into and could not justify the guardrail placement at this crossing. William P. Shrewsberry, a DOTD staff engineer supervisor and a rail-highway safety engineer, agreed with Dr. Berg's assessment of the ditch after he viewed the photographs, and admitted that the ditch would not justify a guardrail. Thus, we find that this critical issue did not present the appellate court with any basis to hold the trial court manifestly erroneous.
A similar result in favor of the trial court's appreciation of the legal issue is also dictated with regard to the culvert, the other reason advanced by the appellate court as justification for the guardrail. As noted above, a culvert runs under the roadway and drains water from south of the road into Bayou Lettsworth, a small waterway located north of the roadway beyond the clear zone. Dr. Rowan, DOTD's safety engineer and accident reconstructionist, agreed that application of the AASHTO guideline to the culvert did not justify the guardrail presence because "fixed objects within the clear zone that warrant protection should be removed." Instead of placing a guardrail to shield motorists from it, DOTD could have simply lengthened the culvert so that the exposed end north of the roadway would have been moved farther away from the travel portion of the highway.
Dr. Rowan also testified that the aggregate railroad embankment provided a additional justification for the placement of the guardrail at the railroad crossing. In essence, Dr. Rowan treated this physical feature as a ditch backslope. Contrarily, Dr. Berg testified that if that were the rule, all railroad crossings would have longitudinal guardrails because all crossings have railroad embankments. Thus, here too the trial court was presented with well grounded, diametrically opposing expert opinions.
Even if the appellate court is convinced that it would have ruled differently had it been the trier of fact, our jurisprudence is replete with citation for the proposition that reversal is not permitted if the trial court's findings are "reasonable in light of the record reviewed in its entirety, ..." Stobart, 617 So.2d at 882-83; see also Housley, 579 So.2d at 976; Sistler, 558 So.2d at 1112. Based upon the record evidence on this issue, we find that the appellate court clearly substituted its opinion for that of the trial court on this question.
Infrequency of daily train crossings. In its analysis, the appellate court also concluded that the likelihood of harm from the placement of the longitudinal guardrail was minimal because trains crossed this highway at this intersection only six times per day. As adroitly pointed out by Lasyone, this conclusion directly contradicts the AASHTO guidelines which state:

*698 [A] traffic barrier should be installed only if it reduces the severity of potential accidents. It is important to note that the probability or frequency of accidents will not in general affect the severity of potential accidents.... "If it is judged that a guardrail installation is not necessary at a particular embankment (that is, the guardrail is a greater hazard than the embankment) .... such a decision remains valid whether one or one thousand vehicles run off the road at that point."
GUIDE FOR SELECTING, LOCATING, AND DESIGNING TRAFFIC BARRIERS § II-A. (Emphasis in original).
From this excerpt it is clear that the severity of impact rather than the frequency of encountering an errant vehicle should have been the focal consideration of the appellate court. To this end, Dr. Berg testified that because this guardrail was placed at the railroad crossing, it was most reasonable to assume that the majority of guardrail impacts at that location would be in avoidance of a train. Thus, we find no basis to support the appellate court's statement to the contrary.

CONCLUSION
Considering the record evidence in light of the manifest error standard, we find that the record clearly supports that the trial court was not manifestly erroneous in its determination that the longitudinal guardrail at this railroad crossing posed an unreasonable risk of harm to this motorist. The record clearly shows that the trial court was presented with sufficient, credible evidence to determine that the guardrail re-directed Lasyone's tank truck into the path of the train and eliminated the means for him to avoid collision with the train.
It was critical for DOTD to prove that a steep embankment, or some other condition, justified the presence of the guardrail. We find it significant that on this critical issue, DOTD failed to offer into evidence any detailed drawings which would have shown the lay of the land at this crossing when the guardrail was installed and when the crossing was upgraded. Moreover, DOTD submitted no evidence to establish what the slope of the embankment was at the time of the accident.
In view of the record evidence, we find that the appellate court failed to heed the manifest error rule and instead impermissibly substituted its opinion for that of the trial court. We must reverse.

REMAND FOR QUANTUM REVIEW
The trial court awarded $2,960,168.60 and made it reducible by the 50 per cent fault attributed to Lasyone. Because the appellate court reversed the trial court on liability, it never addressed the damage award.
Although this Court, like the court of appeal, has appellate jurisdiction of both law and fact, and may perform an independent review and render judgment on the question of damages, see LA. CONST. art. V, § 5(C) and Thomas v. Missoui Pacific R.R. Co., 466 So.2d 1280 (La.1985), we prefer that the court of appeal perform the first appellate review of the damage award.[15] Several considerations prompt *699 our conclusion that the court of appeal is the appropriate body to do this. First, the appellate court has the primary responsibility for reviewing the trial court's factual determinations. Second, the proper allocation of functions between the lower appellate courts and the Supreme Court is best served by consigning the first appellate review of damages to the court of appeal and preserving to this Court discretionary review upon the litigants' petition for certiorari. See Canter v. Koehring Co., 283 So.2d 716, 724 (La.1973) (the preservation of the proper allocation of functions between trial and appellate courts is one reason the appellate courts adhere to the manifest error standard of review).

DECREE
For the foregoing reasons, the judgment of the appellate court is reversed and set aside, and the district court judgment is reinstated. This matter is remanded to the court of appeal to perform the first appellate review of the damages which the trial court awarded to Lasyone.
REVERSED AND REMANDED.
VICTORY, J., dissents and assigns reasons.
TRAYLOR, J., dissents for reasons assigned by VICTORY, J.
LEMMON, J., concurs in part and dissents in part, and assigns reasons.

LEMMON, J., Concurring in Part and Dissenting in Part.
I concur in holding the Department partially liable. While the dissenters would hold plaintiff strictly to his uneducated estimates of time, speed and distance, the trier of fact heard and observed plaintiff on cross-examination about these matters, *700 and concluded that the accident occurred roughly in the manner described by plaintiff. Moreover, while the heavy truck at a moderate speed clearly would have gone over or through the guardrail if struck at a right angle to the rail, the trier of fact apparently concluded that plaintiff glanced off the rail at a much lesser angle while trying to move to the right, and did not strike the rail after making a hard right turn.
Nevertheless, I disagree that this case should be analyzed on the basis of strict liability and with any suggestion that the result would be different if the accident had occurred after the legislative abolition of strict liability.[1]
As the majority notes, the essential difference between a case of simple negligence and a case of strict liability is that the plaintiff in the former case has the additional burden of proving the defendant's knowledge of the harm-causing hazardous or defective condition for which the defendant was responsible. Kent v. Gulf States Utilities Co., 418 So.2d 493 (La. 1982). In the present case, the Department clearly knew of the guardrail that it constructed and either knew or should have known that the placement of the guardrail violated prevailing safety standards. Plaintiff proved that the placement of the guardrail violated applicable safety standards, and the Department failed to produce evidence that the placement of the guardrail was warranted by the presence of a steep embankment. Because the Department was negligent in placing the guardrail at that location and that negligence was a contributing cause of plaintiffs injury, I concur in the determination that the Department was partially at fault.
On the other hand, I dissent from the allocation of fifty percent of the fault to the Department, whose negligence pales greatly in comparison to that of plaintiff. I would not fix the Department's fault at any amount higher than twenty-five percent.
VICTORY, J., dissenting.
Plaintiff was driving an eighteen wheel tractor trailer loaded with 80,000 pounds of asphalt at the time of the accident. According to plaintiff, the only eye witness that testified, when he finally recognized that there was a train in his path, he was only 25-50 feet away from impact. He mashed on his brakes and pulled right simultaneously. At that point he was still going 40-43 mph. Plaintiff claims that when he steered right, he hit the guardrail located only 6 feet off the roadway and was then thrown back into the roadway. He testified that after hitting the guardrail, he was still traveling at least 20 mph when he hit the train.
At his deposition one week before trial, plaintiffs expert agreed that by the time plaintiff hit the train, he was still traveling at 20 mph or greater and that the damage to the train was consistent with the train having been struck at that speed. However by the time of trial, after plaintiff had settled with the railroad, plaintiff's expert formed a new opinion that plaintiff had to have been traveling much slower than plaintiff testified to at trial, that the longitudinal guardrail was improperly placed, and that plaintiff stuck it, causing plaintiff's *701 truck to be redirected into the path of the train.
In my view, the evidence in this case clearly shows that by the time plaintiff saw the train only 25-50 feet from the point of impact and while he was still traveling at 40-43 mph, it was impossible for him to avoid a collision with the train. The guardrail in question, which is still in place on Highway 1, did not cause or contribute to plaintiffs injuries. Even if plaintiff did hit it, traveling at the speed he testified to and pulling an 80,000 pound load, his truck would have driven through the guardrail and he would have hit the train anyway if he was operating his vehicle in the manner he described at trial.
Accordingly, I respectfully dissent.
NOTES
[1] Traffic barriers are classified either as longitudinal barriers or crash cushions. Longitudinal barriers primarily function by redirecting errant vehicles. Crash cushions primarily function by decelerating errant vehicles to a stop. GUIDE FOR SELECTING, LOCATING, AND DESIGNING TRAFFIC BARRIERS § 1-B (American Association of State Highway and Transportation Officials 1977). The guardrail in question was a longitudinal barrier.
[2] The railroad tracks did not intersect Highway 1 at a 90 degree angle. Rather, the evidence preponderates that the tracks cross the highway at a 60 degree angle.
[3] No one criticized the adequacy or appropriateness of the highway signs or the road conditions or its shoulder.
[4] For reference, we have appended Plaintiff's Exhibit P-1-HH (6), a photograph taken 9 days after the accident, which depicts the general lay of the land at the accident site.
[5] Lasyone testified that this was only the second time that he had driven this route across this track. He stated that he saw a bright beam ahead and to the north of the crossing, but thought that it was a light that sportsmen were using to hunt racoons.
[6] At the time of the accident, Lasyone was 24 years of age. He suffered a fracture of both ankles, a fractured left elbow, and a severe compound fracture of his right femur; in addition, he suffered a wound to the back of the head and had a broken tooth. As a result of the surgeries to repair the femur, Lasyone's right leg is approximately one and one-half inches shorter than the left and he suffers back problems because of the differences in leg lengths.
[7] The damages were broken down into the following elements: $2.5 million (past, present and future physical pain and suffering and mental anguish); $85,543.60 (past medical expenses); $156,931.00 (past loss of earnings); and $217,694.00 (future loss of earnings).
[8] No one disputes that Lasyone was negligent or that his negligence was a substantial cause of the accident.
[9] We have noted before that the sole distinction between the burden of proof necessary to recover under a negligent action based on LA. CIV.CODE ANN. art. 2315 versus a strict liability action based on LA. CIV.CODE ANN art. 2317 was that in the former the plaintiff had the additional burden of proving the defendant's scienter, i.e., that the defendant "knew or should have known" of the defect. See, e.g., Sistler, 558 So.2d at 1112 n. 7; Kent v. Gulf States Utilities Co., 418 So.2d 493 (La.1982). Evidence that the risk of harm was unknown or not foreseeable, or that the defendant had acted with reasonable care was irrelevant. Entrevia v. Hood, 427 So.2d 1146, 1148 (La. 1983). LA. CIV.CODE ANN. art. 2317.1, added in 1996, eliminated that distinction. See FRANK L. MARAIST & THOMAS C. GALLIGAN, LOUISIANA TORT LAW § 14-2, at 330-32 (1996) (noting that "[b]y requiring knowledge or constructive knowledge under Article 2317.1, the Legislature effectively eliminated strict liability under Article 2317, turning it into a negligence claim"). Because this accident occurred in 1986 prior to the legislative change which affected LA. CIV.CODE ANN. art. 2317 by the 1996 enactment of new LA. CIV.CODE ANN. art. 2317.1, we will analyze this case under the prior law.
[10] It is undisputed that DOTD had garde of the longitudinal guardrail. Thus, this element of proof need not be discussed.
[11] We recognize that LA.REV.STAT. ANN. § 9:2800 requires actual or constructive notice of the defect as a prerequisite to claims against public entities such as DOTD for damages caused by the condition of things within its care and custody. Thus, in order to prove public entity liability for a thing, the plaintiff must establish: (1) custody or ownership of the defective thing by the public entity; (2) that the defect created an unreasonable risk of harm; (3) that the public entity had actual or constructive notice of the defect; (4) that the public entity failed to take corrective action within a reasonable time; and (5) causation. We take judicial notice, however, that in Jacobs v. City of Bunkie, 98-2510 (La.5/18/99), 737 So.2d 14, this Court held that LA.REV.STAT. ANN. § 9:2800 was a substantive change in the law because it altered the government's duty under LA. CIV.CODE ANN. art. 2317. The constitutionality of this statute was called into question as an abrogation of sovereign immunity contained in Article XII, § 10(A) of the Louisiana Constitution. Effective November 23, 1995, that constitutional provision was amended to allow the Legislature to limit the liability of public entities, including the circumstances giving rise to liability. LA.REV.STAT. ANN. § 9:2800 was reenacted, effective that same date, by 1995 La. Acts 828. This Court concluded that prior to the November 23, 1995 effective date of the amendment, the statute was an impermissible legislative act in direct conflict with Article XII, § 10(A)'s unequivocal waiver of sovereign immunity and was unconstitutional. Id. Because the re-enactment of the statute was a substantive change in the law, we found that LA.REV.STAT. ANN. § 9:2800 could not be applied retroactively.
[12] Although the appellate court did not comment on this factual matter, we have addressed this issue because DOTD continues to maintain in brief that Lasyone's truck did not impact the guardrail. It is clear that without resolution of this important factual issue, the remaining discussion would be moot because there would be no factual basis for it.
[13] Although this provision was not submitted as a separate item of documentary evidence, Dr. William Berg referenced this provision in his deposition of July 8, 1998, and quoted it verbatim during his testimony. Berg Deposition at 60. No other testimony contradicts the accuracy of this documentary evidence. Further, referencing the RAILROAD-HIGHWAY GRADE CROSSING HANDBOOK, Dr. Rowan agreed with the general concept there should be a refuge area for drivers to take evasive action at railroad crossings.
[14] Dr. Berg testified that accepted engineering practice requires the AASHTO and Handbook guidelines to be followed; if these guidelines are not followed, it is incumbent upon DOTD to document why an exception is required.
[15] We note that at oral argument Lasyone specifically requested that we address the damage issue because the injured plaintiff was originally injured in 1986 and far too much time had passed without compensation. Although we are keenly aware of the time that has elapsed, we note that the courts have not been dilatory. Trial concluded in mid-summer and judgment was rendered in the trial court in the autumn of that same year. An appeal was forthcoming and a decision was rendered on June 23, 2000. We granted Lasyone's writ application on December 8, 2000, and oral argument was heard on February 22, 2001.
[1] I also disagree with some language quoted from earlier opinions that the Department's duty to maintain highways in a reasonably safe condition is owed to motorists exercising reasonable care. As the majority notes in disagreeing with the court of appeal on the point, that duty is owed to all motorists. The motorist's failure to use proper care, while relevant to contributory negligence, does not in any manner affect the determination of the Department's negligence.