35 So.3d 388 (2010)
In re Medical Review Panel for the Claim of Verna BARTHELEMY
Verna Barthelemy, Wife of/and Martin Barthelemy
v.
The State of Louisiana Through the Louisiana State University Health Science Center of New Orleans, Doing Business as the Medical Center of Louisiana at New Orleans, and Dr. Timothy Mountcastle.
Nos. 2009-CA-1198, 2009-CA-1199.
Court of Appeal of Louisiana, Fourth Circuit.
March 17, 2010.
*389 James E. Brouillette, Metairie, LA and Joseph R. Ward, Jr., Ward & Condrey, LLC, Covington, LA, for Verna Barthelemy and Martin Barthelemy.
Dennis J. Phayer, Meredith M. Miceli, Burglass & Tankersley, L.L.C., Metairie, LA, for Board of Supervisors of Louisiana State University and Agricultural and Mechanical College and Dr. Mountcastle.
(Court composed of Chief Judge JOAN BERNARD ARMSTRONG, Judge JAMES F. McKAY, III and Judge DAVID S. GORBATY).
JOAN BERNARD ARMSTRONG, Chief Judge.
Plaintiffs-appellants, Verna Barthelemy, wife of and Martin Barthelemey, appeal a judgment dismissing their medical malpractice claim against the defendants, Dr. Timothy Mountcastle and The State of Louisiana through the Board of Supervisors of Louisiana State University Agricultural and Mechanical College (hereinafter sometimes referred to as "Charity Hospital"). We affirm.
This medical malpractice action arises out of the plaintiff, Mrs. Barthelemy's, claim that she suffered injury to her left ureter[1] during a cancer-eradicating, laparoscopic assisted sigmoid colon resection at Charity Hospital on January 18, 2002.
This is a fact intensive manifest error case.
On January 16, 2002, the plaintiffs initiated a medical review panel proceeding against the staff attending physician, Dr. Michael Boyle, the resident assisting surgeon, Dr. Timothy Mountcastle, and their employer, the State, under the Malpractice Liability for State Services Act, La. R.S. *390 40:1299.39 et seq. The panel, comprised of general surgeons Dr. Rene Deboisblanc, Dr. Alan Levin, and Dr. Ruary O'Connell, found no malpractice, no deviation from the applicable standard of care.
Plaintiffs, thereafter, filed this post-panel civil action against Dr. Mountcastle and the State on February 17, 2005. Although, Dr. Boyle was not named as a defendant in this proceeding, as will be shown hereinafter, he performed the majority of the operation as the lead surgeon.
A jury trial was held on November 17, 18, and 19, 2008. The jury returned a verdict in favor of defendants. On December 3, 2008, the district court rendered and signed a judgment granting the defendants' motion to make the jury's verdict the judgment of the court and dismissed the plaintiffs' claims against the defendants with prejudice. The judgment specifically noted that the jury found, "that defendants did not breach the standard of care under La. R.S. 9:2794".
Plaintiffs thereafter moved the trial court for a Judgment Notwithstanding the Verdict and/or a New Trial. The court denied the motion.
Informed consent is not an issue in this case. It is uncontested that one of the recognized risks of a sigmoid colon is damage to the ureter. Mrs. Barthelemy signed a consent form and does not challenge the issue of consent. It is also uncontested that the resection surgery on plaintiff was a life-saving measure, the nonoccurrence of which would have resulted in her death from cancer. Finally, it is uncontested that the standard of care requires that the ureter be identified and preserved. The sole malpractice issue before this Court is whether this standard of care was met.
Plaintiffs called the following witnesses: Themselves; their daughter, Nina Miller; the defendant, Dr. Mountcastle; and their retained expert, Dr. Claude Minor, by video deposition. Defendants called the defendant, Dr. Mountcastle; Dr. Michael Boyle by video deposition; medical review panelist Dr. Rene Deboisblanc by video deposition; Dr. Scott Delacroix; and Marshall Carll of the Charity Hospital Forms Department.
No reference is made by the plaintiffs in their appeal to the testimony of Mr. and Mrs. Barthelemy and that of their daughter, Nina Miller. Their testimony bore mostly on the subject of damages which is not an issue raised by the plaintiffs in this appeal. Therefore, we do not find their testimony to be material to the analysis of this appeal.
The defendants offered the video deposition of Dr. Scott Delacroix. However, as he did not testify as an expert and he only became involved in Mrs. Barthelemy's treatment after the operation that is the subject of this appeal, his testimony is not relevant to the question of whether any malpractice occurred during Mrs. Bartelemy's surgery.
Mr. Marshall Carll's testimony related to a controversy raised by the appellants at the trial level over certain inferences to be drawn from the format of certain forms in Mrs. Barthelemey's medical records. The appellants have not pursued this issue on appeal. Therefore, Mr. Carll's testimony is not relevant to any of the issues raised on this appeal.
The defendant, Dr. Mountcastle, was in the third year of a five year General Surgery residency program at Louisiana State University Medical School at the relevant time. He was still considered a junior resident. The type of laparoscopic-assisted procedure in question, on which he had previously assisted, is considered a complex one, reserved for upper-level residents or staff to primarily perform.
*391 Dr. Mountcastle testified that he did not identify and preserve the ureter. The defendants base their malpractice claim on this admission. Moreover, defendants also rely on the fact that in his pre-trial deposition, Dr. Mountcastle stated that "we" did not identify and preserve the ureter, the "we" being an implied reference to both himself and Dr. Boyle. He changed his position at trial, explaining that when he gave his deposition he used the term "we" too loosely. He further explained that he was so focused on what he was doing during the operation that he was in no position to attest to what Dr. Boyle may have seen during the course of the operation. The plaintiffs urge this inconsistency between Dr. Mountcastle's pre-trial testimony and his testimony at trial as a basis for this Court to make a finding that the result reached by the jury and the trial court was manifestly erroneous:
Where documents or objective evidence so contradict a witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness's story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. But where such factors are not present, and a factfinder's finding is based on its decision to credit the testimony of one or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong. Rosell v. ESCO, 549 So.2d 840, 844-845 (La.1989).
Johnson v. Department of Police, 08-0467, pp. 10-11 (La.App. 4 Cir. 12/10/08), 2 So.3d 501, 509.
Therefore, this Court must determine, among other things, whether the inconsistencies in Dr. Mountcastle's testimony are so significant as to constitute manifest error.
The plaintiffs also point to the fact that Dr. Boyle contradicted Dr. Mountcastle's assertion that they were not operating in the vicinity of the ureter. This conflicting testimony raises a similar question of possible manifest error.
However, it is the position of the defendants that Dr. Boyle was in charge of the operation and that he identified and preserved the ureter, thereby meeting the standard of care, consistent with the result reached by the medical review panel. As Dr. Mountcastle concedes that he did not identify and preserve the ureter, the malpractice question becomes one of whether it was his responsibility to do so or whether it was Dr. Boyle's responsibility to do so, and, if so, did he do so.
It is uncontested that Mrs. Barthelemy had the surgery on Friday, January 18, 2002, and that she was discharged to go home on the following Monday. She first noticed pain about nine days later on Wednesday of the following week at which time she reported it during a routine post-op follow-up visit to Charity Hospital. It is also uncontested that the sequelae of her ureter problems have been severe and painful, but this Court has not been asked to quantify her damages as part of this appeal.
Dr. Mountcastle testified that he, "was a third-year level resident, which is considered a junior resident." Although he testified that he would be what he referred to as the "primary" surgeon on Mrs. Barthelemy's case, he explained that the person ultimately responsible for this surgery was Dr. Boyle. Later, when asked again by plaintiffs' counsel for the name of the "supervising physician," he responded: "Dr. Boyle."
Dr. Mountcastle explained that:

*392 Well, basically when we were doing the internal portion [Dr. Boyle] was directing. He would say burn here, cut here; and I would just follow his instructions.
Dr. Mountcastle explained that the "staff attending physician," in this case Dr. Boyle, was the "surgeon in the operating room . . . [who] determines what gets done by who, and he's the supervising surgeon in the case." Dr. Mountcastle next testified that during the course of the operation he was acting under Dr. Boyle's "control and supervision":
A. He was in charge. He was there for the entire case. And as I stated before, he did the majority of the case, especially when we got down into the areas around the ureter.
Q. Can you quantify approximately the division of labor between you and Dr. Boyle?
A. Seventy-five percent for him, 25% for me.
* * *
[Dr. Boyle] was directing me. Everything, you know I did, he would say yes. I would say should I cut here? Yes. Where do you want the trocars placed? Put them here, here, and here.
Dr. Mountcastle explained it this way: "[I]t might have been my hand, but he was directing every single maneuver that I did."
Dr. Mountcastle testified specifically that the ureter was not in any of the areas of the operation where he was performing the surgery. He explained that after a certain point, he could not see what was happening because he was "holding the retractors" while Dr. Boyle was performing the surgery. Later in his testimony he explained again that he could not see or know exactly what Dr. Boyle was doing. He also explained that when he made references to "we" in his pretrial deposition he should have more specifically limited his references to "me" or "I"
Dr. Mountcastle testified that the ureter was in proximity to the surgical work Dr. Boyle was doing, but that Dr. Boyle never mentioned any problems with the ureter. Dr. Mountcastle testified that he had no reason to suspect that there was any damage to the ureter. He testified that the preparation of the operative report is the responsibility of the resident, and that he prepared the report in this case. He testified that although he prepared the report, it would have been signed by another resident, a common practice when the resident who prepared the report was unavailable because the residents were frequently rotated to other locations.
The plaintiffs offered the videotape deposition testimony of their expert, Dr. Claude Minor. He never examined the patient. He reviewed medical records and depositions. He concluded that the damage Mrs. Barthelemy sustained to her ureter was likely related to the surgery, and that:
... I think if a surgeon does a colectomy for a cancer or a colectomy for anything as a matter of fact, there is no question, at some point during his surgery he should identify the ureter and make certain that it is intact and no problem has arose [sic] regarding it. Based on my review of the operative report and review of the deposition, that was not done. Even more so my concerns are, if it is true as stated in the deposition that we did not operate close to the ureter, then I question whether a true cancer operation was done. Because an operation on the colon for cancer is a different operation from benign disease. When you operate on the colon for cancer, you are obligated to go down to the *393 root of the mesentery and take out as many lymph nodes as you can. If you do that, then by definition you're going to be close to the ureter.
However, Dr. Minor went on to testify that he couldn't tell what part of the surgery was done by Dr. Mountcastle and what part was done by Dr. Boyle. He further testified that: "I don't think a uretal injury is necessarily a breach of a standard of care." His conclusion concerning negligence on the part of Dr. Mountcastle was based on (1) his opinion that the ureter had not been identified and preserved and (2) the assumption that Dr. Mountcastle really did the surgery. This conflicts with the testimony of the defense witnesses and Dr. Boyle's perioperative report. Moreover, Dr. Minor testified that in rendering his opinion he chose not to consider Dr. Boyle's perioperative report, the report that Dr. Debloisblanc considered the most significant as it is the report prepared immediately after the operation. In this case, the timing of the report adds to its significance and persuasiveness, as it was written prior to the time there were any symptoms of damage to the ureter.
Thereafter, the defendants introduced the video deposition of Dr. Rene Deboisblanc. He was accepted as an expert in the field of general surgery. He testified that in the four or five years prior to the time of his deposition he had done approximately a dozen operations of the type performed on Mrs. Barthelemy. He was on the medical review panel selected to review Mrs. Barthelemy's claims of malpractice. He testified that no member of the panel found a breach of the standard of care. He testified that Dr. Boyle's perioperative report noted that the left ureter was identified laparoscopically and preserved. He further testified that this established that the standard of care was met. He went on to explain that Dr. Mountcastle could not know what Dr. Boyle may have seen and that, "Dr. Boyle is very definite in his note immediately after the surgery procedure was completed before any of the uretal injury business was an issue because that wasn't discovered until days later."
Dr. Deboisblanc testified that part of his training was at Charity. He explained that while he referred to the resident Dr. Mountcastle as the "primary physician," Dr. Boyle as the staff physician would have been in charge of the operating room. He would have been "running" things in the operating room. He would also supervise the resident physician, in this case, Dr. Mountcastle. Accordingly, he testified that he would have no reason to dispute Dr. Boyle's assertion that he supervised every maneuver made by Dr. Mountcastle.
Dr. Deboisblanc went on to testify that an injury to the ureter is a well-known complication of this type of colon cancer surgery and that it sometimes happens no matter how careful you are. It was his opinion that the cause of the damage to Mrs. Barthelemy's ureter, "was probably something that the operation did that affected her ureter." He explained that:
The common things that can occur during an operation are cutting of a ureter, placing a clip on the ureter, or just being next to the ureter.
The uretermobilization required to do the operation appropriately sets up an inflammatory reaction. This inflammatory reaction sometimes can disturb the blood supply to a section of ureter and you can get a stricture from that.
The symptoms that she had didn't occur immediately as one would expect if the ureter were either cut or clipped, but it occurred later and the way it presented makes me thing that probably it was the inflammatory reaction from just being next to the ereter in doing the operation *394 to remove the sigmoid colon that caused the injury.
Later, on cross-examination, Dr. Deboisblanc testified that:
Even if it's a ureter that looks perfectly normal when you complete the procedure, can form a stricture later on, if you disrupt the blood supply and that's a risk of everything you do.
In fact, Dr. Deboisblanc testified that on occasion he had found it safer to perform the operation without identifying the ureter and that it could be done. He explained that it was the standard of care to identify the ureter, unless you encounter a reason not to. He also explained that when Dr. Mountcastle says that he is the primary physician and Dr. Boyle was the attending physician, that, "[t]hat's just verbiage. Okay. The ultimate responsibility is to the attending physician."
The plaintiffs' argument is basically two pronged: That there are inconsistencies between Dr. Mountcastle's pretrial deposition testimony and his trial testimony; and that we should accept the testimony of his expert, Dr. Minor, over that of the defendants' witnesses. However, the Louisiana Supreme Court has reiterated the long standing rule of manifest error as it applies in such situations:
Indeed, where the factfinder's determination is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous. Id. at 845. This rule applies equally to the evaluation of expert testimony, including the evaluation and resolution of conflicts in expert testimony. Lasyone v. Kansas City Southern Railroad, 00-2628, p. 13 (La.4/3/01), 786 So.2d 682, 693.
Adams v. Rhodia, Inc., 07-2110, p. 11 (La.5/21/08), 983 So.2d 798, 807
Dr. Boyle, a fellowship-trained surgical oncologist board certified as a general surgeon was accepted as an expert in the field of general surgery. At the time of this operation he was a full time professor and general surgeon at LSU Medical School. He testified by video deposition at trial as follows:
It is the ultimate responsibility of the staff physician to ensure that the ureter is identified either by the staff physician or the resident under his or her instruction or supervision.
He testified that he had performed hundreds of laparoscopic surgeries in general of which a number were sigmoid colectomies.
Dr. Mountcastle is listed on the Operative Report as the "primary" surgeon, but Dr. Boyle explained that the use of the term "primary" was really an issue of semantics. Dr. Boyle also testified that in spite of the fact that residents in the course of their training often were allowed to believe that they were the primary physician, they were, in fact, supervised in everything they did. Therefore, residency records referring to the resident as the primary surgeon, did not change the fact that the resident was operating under supervision. This is consistent with Dr. Mountcastle's testimony:
[P]rimary surgeon is a resident term where you get to count the case toward your number of cases that you've done. You're the only other surgeon in my case with the staff. That doesn't mean you're going to be doing the entire surgery yourself, may not be doing anything; but that's all dependent on what the staff lets you do. So it's just a technical term.
Dr. Boyle testified that his memory of visualizing and preserving the ureter was unequivocal and that his memory in this regard was not based on a review of medical *395 records, but was direct. He testified that he was operating in the area of the ureter. He testified that the ureter is usually seen more than once during the course of the operation, but he disagreed with Dr. Minor that it necessarily must be identified again at the end of the procedure. He testified that while in his opinion the right thing to do is to visualize and isolate the ureter, that is not a universally held opinion and not necessarily the standard of care. He explained that there are some who do not believe in visualizing and isolating the ureter because there is some risk of damaging the ureter in the process. Therefore, he explained, that although he believed in visualizing and isolating the ureter, he did not believe that it was necessarily the standard of care in general, but that if he failed to do so, it would have "fallen below [his] normal standard of care." He testified that he thought that Mrs. Barthelemy's problems with her ureter were most probably related to the surgery, but he couldn't be sure.
Dr. Boyle prepared a perioperative report as is customary with staff physicians. Drs. Boyle and Deboisblanc confirmed this. When shown the Intraoperative Anesthesia Record, Dr. Boyle testified that he was listed as the attending physician, with Dr. Mountcastle as his "first assistant."
Both Drs. Boyle and Mountcastle testified as to Dr. Mountcastle's limited participation in the procedure, as well as the complete absence of any unsupervised, independent actions on his part.
After reviewing the record as a whole as we are required to do, we find no manifest error in the finding of the jury that the standard of care was not breached in this case. We find that the jury could have reasonably believed Dr. Mountcastle when he testified at trial that when he used the term "we" in his testimony prior to trial he should have restricted his comments to "I" or "me" because he was in no position to speak for Dr. Boyle. This is confirmed by the testimony of both Dr. Boyle and Dr. Debloisblanc who both testified that Dr. Mountcastle was in no position to know what Dr. Boyle may have seen and done during much of the operation.
We further find that, based on the testimony of all of the defendants' medical witnesses, that the jury could reasonably find that Dr. Boyle was in charge of the operation, and that Dr. Mountcastle was acting under his direct supervision at all relevant times. We also find that the jury could reasonably find credible Dr. Boyle's testimony that he identified and preserved the ureter as supported by the perioperative report and the testimony of Dr. Debloisblanc. We further find that the jury was also entitled to make this finding in view of the fact that even the plaintiffs' expert testified that there was always a risk of damaging the ureter even when there was no deviation from the standard of care. This finding is reinforced by Dr. Debloisblanc's opinion that the damage to the ureter was merely an inflammatory reaction. This opinion seems particularly reasonable and credible in view of Dr. Debloisblanc's explanation that direct trauma to the ureter would have caused symptoms to appear much sooner than those of Mrs. Barthelemy.
We also find that the jury may have reasonably chosen to credit Dr. Boyle's and Dr. Debloisblanc's reliance on Dr. Boyle's perioperative report in preference to the decision of the plaintiffs' expert, Dr. Minor, to ignore that report. Additionally, we find that the jury could reasonably have disregarded the conflict between Dr. Mountcastle's testimony that the surgery was never in the vicinity of the ureter in preference to that of Dr. Boyle who had considerably more experience and was in a *396 better position to observe what was going on as it was he who performed most of the operation.
In sum, after reviewing the record as a whole, we find valid reasons why the jury could reasonably chose to adopt the defense version of the facts in preference to that of the plaintiffs. Accordingly, pursuant to our finding that Dr. Boyle effectively discharged the responsibility necessary to meet the standard care we find no manifest error in the jury finding that defendants did not breach the standard of care.
For the foregoing reasons we affirm the judgment of the trial court, at plaintiffs' cost.
AFFIRMED.
NOTES
[1] Ureters are muscular tubes propelling urine from the kidneys to the bladder. The failure of a ureter to function properly can, among other things, result in a painful backup of urine into and damage to the kidneys.