# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## CW 04-1674
## consolidated with CW 05-43


**PAT SWIDO AND TOMMIE SWIDO**

**VERSUS**

**LAFAYETTE INSURANCE COMPANY, ET AL.**


************

SUPERVISORY WRITS FROM THE
TWELFTH JUDICIAL DISTRICT COURT,
PARISH OF AVOYELLES, NO. 2000-783,
HONORABLE MARK A. JEANSONNE, DISTRICT JUDGE

************

## MICHAEL G. SULLIVAN
## JUDGE

************

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Michael G. Sullivan, and Elizabeth A. Pickett, Judges.


**WRITS GRANTED AND MADE PEREMPTORY.**

**Russell L. Potter**
**Andrew Parker Texada**
**Stafford, Stewart & Potter**
**Post Office Box 1711**
**Alexandria, Louisiana  71309**
**(318) 487-4910**
**Counsel for Defendants/Applicants:**
   **Lafayette Insurance Company**
   **Erica Gaillard**
   **Mark Gaillard**

**Raymond L. Brown, Jr.**
**Steven M. Oxenhandler**
**Gold, Weems, Bruser, Sues & Rundell**
**Post Office Box 6118**
**Alexandria, Louisiana  71307-6118**
**(318) 445-6471**
**Counsel for Defendant/Respondent:**
        **Miki Gaillard**

**Edgar John Litchfield**
**Attorney at Law**
**400 Poydras Street, Suite 2000**
**New Orleans, Louisiana  70130**
**(504) 568-0541**
**Counsel for Intervenor/Respondent:**
        **Charity Hospital & Medical Center of Louisiana**

**Robert Hairford**
**Attorney at Law**
**219 Europe Street**
**Baton Rouge, Louisiana  70802**
**(225) 267-6786**
**Counsel for Respondent:**
        **Estate of Herman Hairford**

**Christopher J. Roy, Sr.**
**Timothy D. Shumate**
**Roy Law Office**
**Post Office Box 1911**
**Alexandria, Louisiana  71309-1911**
**(381) 487-9537**
**Counsel for Plaintiffs/Respondents:**
        **Pat Swido**
        **Tommie Swido**

SULLIVAN, Judge.

Mark and Erica Gaillard, Lafayette Insurance Company (Mark and Erica's homeowners' insurer), and Miki Gaillard applied to this court for writs after the trial court denied their motions for summary judgment. We granted the writ applications to determine whether the trial court's denial of summary judgment in favor of the Gaillards and Lafayette Insurance Company was correct. For the following reasons, the judgment of the trial court is reversed, and Plaintiffs' claims against these defendants are dismissed with prejudice.

### Facts

On August 30, 1999, Herman Hairford informed Pat and Tommie Swido that he had a filly, Mary Mae, for sale. That afternoon the Swidos accompanied him to Mark and Erica's home where Mary Mae was pastured to see her. As Mr. Swido was performing a preliminary inspection of Mary Mae, Mrs. Swido mounted Mary Mae bareback. Mary Mae crow-hopped, and Mrs. Swido lost her seat and fell to the ground, severely fracturing her right arm.

The Swidos sued Mr. Hairford, Mark, Erica, Lafayette Insurance Company, and Miki, Mark's brother, for damages. Mark, Erica, Lafayette Insurance Company, and Miki filed motions for summary judgment, seeking dismissal of the Swidos' claims against them. Mr. Hairford died after suit was filed. He was not deposed before his death.

### Summary Judgment

Appellate courts review summary judgments *de novo* under the same criteria that govern the trial court's consideration of whether a summary judgment is appropriate. *Schroeder v. Bd. of Supervisors of La. State Univ.*, 591 So.2d 342 (La.1991). The mover is entitled to judgment "if the pleadings, depositions, answers

to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that the mover is entitled to judgment as a matter of law." La.Code Civ.P. art. 966(B).

The initial burden of proof is on the mover to show that no genuine issue of material fact exists. La.Code Civ.P. art. 966(C)(2). However, if the mover will not bear the burden of proof at trial on the issue that is before the court on the motion for summary judgment, he is not required to negate all essential elements of his opponent's claim but need only point out that there is an absence of factual support for one or more elements essential to his opponent's action. If the opponent "fails to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial, there is no genuine issue of material fact." *Id.*

### *Discussion*

### *Ownership of Mary Mae*

Resolution of this matter is dependent in part upon whether Mary Mae was sold to Herman Hairford on August 29, 1999. The Swidos contend that Mark, Erica, and Miki co-owned Mary Mae on August 30, 1999, the date of Mrs. Swido's injuries.[1] The Gaillards urge that Mark sold Mary Mae to Mr. Hairford on August 29, 1999; therefore, they did not own Mary Mae when Mrs. Swido was injured and are not liable for her injuries.

The evidence establishes that on August 29, 1999, Mr. Hairford paid Mark $1,400.00 in cash, which represented the sale price of $1,200.00 and $200.00 for Mark to finish training Mary Mae, who was approximately sixteen months old and

---

[1]The Gaillards assert that Miki gave Mary Mae to Mark for allowing him to pasture Stormy, Mary Mae's mother, in his pasture during her pregnancy and after her delivery until Mary Mae was weaned. For the reasons that follow, we conclude that Mary Mae was sold to Mr. Hairford on August 29, 1999. Therefore, we need not address whether the Gaillards co-owned Mary Mae before that date.

2

"green-broke," i.e., not completely trained and not trained to be ridden. The Swidos contend that the completion of Mary Mae's training was a suspensive condition which suspended the effect of the sale of Mary Mae to Mr. Hairford and that the Gaillards still owned her at the time of Mrs. Swido's accident.

A sale occurs and "[o]wnership is transferred between the parties as soon as there is agreement on the thing and the price is fixed, even though the thing sold is not yet delivered nor the price paid." La.Civ.Code art. 2456. Louisiana Civil Code article 1767 provides: "A conditional obligation is one dependent on an uncertain event. If the obligation may not be enforced until the uncertain event occurs, the condition is suspensive. If the obligation may be immediately enforced but will come to an end when the uncertain event occurs, the condition is resolutory."

The evidence establishes that on August 29, 1999, Mark and Mr. Hairford agreed on the thing, Mary Mae, and the price, $1,200.00. Pursuant to La.Civ.Code art. 2456, the sale of Mary Mae to Mr. Hairford was perfected at that time. The men further agreed that Mark would complete Mary Mae's training for $200.00. Mr. Hairford paid Mark $1,400.00 that day. The following events, which occurred after August 29, 1999, evidence Mark and Mr. Hairford's intent regarding the sale of Mary Mae and that the sale was complete that date: 1) Mr. Hairford's efforts to sell Mary Mae; 2) Mr. Hairford's representations to the Swidos that he owned Mary Mae; 3) Mark's return and Mr. Hairford's acceptance of the $200.00 he paid to Mark for completion of Mary Mae's training; and 4) Mr. Hairford's retrieval of Mary Mae from the Gaillards after August 30, 1999.

Based on the evidence, we conclude that Mark and Mr. Hairford had two separate agreements with regard to Mary Mae, one for her sale for $1,200.00 and one

for her training for $200.00, which were not conditioned upon each other, and that the sale of Mary Mae to Mr. Hairford was perfected August 29, 1999.

The Swidos point to documents, which pertain to registration of Mary Mae's ownership and transfer of ownership filed with the National Spotted Horse Association, Inc. (NSHAI) in October 2001, to argue that Mary Mae was not sold to Mr. Hairford. The documents state that Miki transferred ownership of Mary Mae to Toby Liner on that date. We have not considered these documents because none of them are sworn or verified. "Unsworn and unverified documents are not of sufficient evidentiary quality to be given weight in determining whether there is a genuine issue of material fact." *Rhodes v. Executive Risk Consultants, Inc.*, 26,021, p. 4 (La.App. 2 Cir. 8/17/94), 642 So.2d 269, 273. Accordingly, these documents do not affect our conclusion that Mark sold Mary Mae to Mr. Hairford on August 29, 1999.

We note that, during oral arguments on these motions, the trial court observed that a continuance could be granted in favor of the Swidos to obtain affidavits and/or certified copies of the NSHAI documents. Verified or certified copies of the documents would not affect our conclusion. In *Touchet v. Guidry*, 550 So.2d 308 (La.App. 3 Cir. 1989), this court was faced with a similar situation involving the sale of an automobile. The defendant insurer argued that the automobile was not owned by its insured at the time of the accident and was not covered by its policy of insurance because title to the automobile had not been transferred to its insured through the Department of Motor Vehicles. The court rejected the argument, explaining:

> [U]nder Louisiana law, title to motor vehicles, though imperfect, may be transferred between the parties in accordance with the provisions of the Civil Code even though they have not complied with the Vehicle Certificate of Title Law (LSA-R.S. 32:701 et seq.)[.] The registration

4

> of sales of motor vehicles under the Vehicle Certificate of Title Law is an administrative proceeding which does not bear any essential relationship to transfer of motor vehicles under the provisions of the Civil Code.

*Id*. at 313 (citations omitted). Louisiana law does not require registration of horses. Therefore, the Swidos argument is more tenuous than the insurer's argument in *Touchet*. Registration documentation regarding Mary Mae filed with the NSHAI has no bearing on the transfer of her ownership pursuant to La.Civ.Code art. 2456.

### *Strict Liability*

The Swidos contend that, even if the Gaillards did not own Mary Mae at the time of Mrs. Swido's accident, they are liable to them pursuant to La.Civ.Code art. 2317. Article 2317 provides:

> We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody. This, however, is to be understood with the following modifications.

Article 2317.1 which follows provides:

> The owner or custodian of a thing is answerable for damage occasioned by its ruin, vice, or defect, only upon a showing that he knew or, in the exercise of reasonable care, should have known of the ruin, vice, or defect which caused the damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care.

A plaintiff who asserts a cause of action pursuant to La.Civ.Code art. 2317 must prove that the vice or defect of the property in question posed an unreasonable risk of harm to others. *Boyle v. Bd. of Supervisors*, 96-1158 (La. 1/14/97), 685 So.2d 1080. The determination as to the existence of an unreasonable risk of harm is made using a risk/utility analysis, which should be made "in light of all relevant moral, economic and social considerations." *Entrevia v. Hood*, 427 So.2d 1146, 1147 (La.1983).

5

[T]he fact that an accident occurred because of a vice or defect does not elevate the condition of the thing to that of an unreasonably dangerous defect. *The vice or defect must be of such a nature as to constitute a dangerous condition that would be reasonably expected to cause injury to a prudent person using ordinary care under the circumstances.*

*Lasyone v. Kansas City So. R.R.*, 00-2628, pp. 14-15 (La. 4/3/01), 786 So.2d 682, 694

(emphasis added) (citations omitted).

In *Smith v. American Indemnity Insurance Co.*, 598 So.2d 486, 490 (La.App. 2 Cir.), *writ denied*, 600 So.2d 685 (La.1992), the court considered whether an untrained horse presented an unreasonable risk of harm. With regard to the requisite risk/utility analysis to be made in such cases, the court explained:

> Much of the jurisprudence dealing with animal owner liability does not set forth a complex analysis of the risk-utility test in determining whether a risk of harm was unreasonable. In *Boyer v. Seal*, [553 So.2d 827 (La.1989)], the plaintiff was injured when a house cat brushed against her leg and caused her to fall. The court determined that the cat did not pose an unreasonable risk of harm. Similarly, in *Rozell v. Louisiana Animal Breeders Cooperative, Inc.*, 496 So.2d 275 (La.1986), the court found that a bull *did* pose an unreasonable risk of harm in that it was explosively dangerous and posed an unreasonable hazard of injury. In *Andrade v. Shiers,* [564 So.2d 787 (La.App. 2 Cir.), *writ denied*, 567 So.2d 1128 (La.1990)], this court concluded that a domesticated cow, accustomed to being around people, is not inherently dangerous. However, a cow with a newborn calf poses an unreasonable risk of harm to any person who places himself in reasonable proximity to the calf.

> In each case, the issue of whether the animal posed an unreasonable risk of harm was determined without a complex analysis under the risk-utility test. Likewise, in the present case, the issue of whether this horse posed an unreasonable risk of harm to this plaintiff does not involve a hyper-technical analysis.

*Id*. at 490. The court then proceeded with its analysis of the facts. The horse in

*Smith*, was two years old and not fully trained; however, its trainers had been riding

it before it was sold. The plaintiff, an experienced rider, was injured when she

attempted to ride the horse. The court of appeal affirmed the jury's finding that the horse did not present an unreasonable risk of harm.

In *Florice v. Brown*, 28,538, pp. 5-6 (La.App. 2 Cir. 8/21/96), 679 So.2d 501, 504, *writ denied*, 96-2331 (La. 11/22/96), 683 So.2d 281 (citations omitted), the court affirmed the trial court's determination that the horse at issue did not present an unreasonable risk of harm, observing:

> Not every risk of injury posed by an animal is an *unreasonable* risk. In general, horseback riding entails the risk of being thrown whether one is an experienced equestrian or a beginning rider. . . .
>
> We also observe that the likelihood of serious injuries such as those suffered by the plaintiff in this case or in *Smith* are remote, although not uncommon. This is a key factual consideration in the risk-utility analysis. Figuratively speaking, the product of the likelihood (or risk) of injury from being thrown from a horse multiplied by the gravity of the harm suffered by the plaintiff is quite low when compared to the social and economic utility of horses in our society.

Mark told Mr. Hairford Mary Mae was green-broke and had not been ridden before he sold her to him. He explained and demonstrated that he could put a saddle on her, mount her, and sit in the saddle. He did not ride her. Mr. Hairford bought Mary Mae *and* contracted with Mark to complete her training. The record establishes that persons knowledgeable of horses know that a green-broke horse is not completely trained and is not ready to be ridden. The record also establishes that the Swidos are knowledgeable of horses. They own horses and participate in trail rides and other equestrian events. Mr. Swido testified that a green-broke horse can only be led by a lead rope with a halter on its head.

According to Mr. Swido, Mr. Hairford told him and Mrs. Swido that Mary Mae was "completely trained, broke, ready to go, it was a two year old, that the only thing

7

she needed was a little bit of neck reining." Mr. Swido also testified that Mr. Hairford told them children rode Mary Mae bareback.

Mr. and Mrs. Swido described the events leading to Mrs. Swido's accident. Mr. Hairford told them Mary Mae was gentle and could be ridden bareback and prompted Mrs. Swido to ride Mary Mae bareback. The three of them entered the pasture with Mary Mae. Mr. Swido held Mary Mae's halter, while Mr. Hairford helped Mrs. Swido swing herself up on Mary Mae's back. Mary Mae reared and began bucking. Mr. Swido could not keep his hold on the halter; Mrs. Swido could not maintain her seat and was thrown to the ground within five seconds or so.

The evidence establishes that an ordinary prudent person, like Mr. or Mrs. Swido, would not attempt to ride a horse that is only green-broke without taking special precautions. Under these facts, we find that Mary Mae did not constitute an unreasonable risk of harm.

### *Negligence*

The Swidos contend the Gaillards were negligent because Erica did not warn them Mary Mae was green-broke and could not be ridden.

> To prevail on a negligence claim under La.Civ.Code art. 2315[3] and La.Civ.Code art. 2316[4], the plaintiff must prove five separate elements: (1) the defendant had a duty to conform his conduct to a specific standard (the duty element); (2) the defendant failed to conform his conduct to the appropriate standard (the breach of duty element); (3) the defendant's substandard conduct was a cause-in-fact of the

---

[3]Art. 2315 provides, in part:

Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it.

[4]Art. 2316 provides:

Every person is responsible for the damage he occasions not merely by his act, but by his negligence, his imprudence, or his want of skill.

plaintiff's injuries (the cause-in-fact element); (4) the defendant's substandard conduct was a legal cause of plaintiff's injuries (the scope of liability or the scope of protection element); and, (5) actual damages (the damages element).

*Roberts v. Benoit*, 605 So.2d 1032, 1051 (La.1991). A negative answer to any of these inquiries will result in the determination of no liability. *Mathieu v. Imperial Toy Corp.*, 94-952 (La. 11/30/94); 646 So.2d 318.

The Gaillards assert they did not owe the Swidos a duty to warn them not to ride Mary Mae. "Whether a duty is owed is a question of law." *Hardy v. Bowie*, 98-2821, p. 12 (La. 9/8/99), 744 So.2d 606, 614. The Gaillards did not know Mr. Hairford was going to bring prospective buyers to their home. Mark was not home when the accident occurred and did not learn about it until after it occurred. Erica was home in the yard talking on the telephone to her sister-in-law when Mr. Hairford and the Swidos arrived. She was no longer on the telephone when the accident occurred; however, she testified that she did not participate in Mr. Hairford's discussion with the Swidos and did not know that he told them Mary Mae was trained to be ridden. She further testified that "[e]verything went too fast" and that she did not realize the Swidos were going into the pen with Mary Mae. Her testimony is not disputed.

A landowner is not an insurer against the possibility of an accident; he must act as a reasonable person in view of the probability of injury to another. *Lejeune v. Acadia Parish Sch. Bd.*, 517 So.2d 1030 (La.App. 3 Cir. 1987). Thus, we must determine if Erica acted reasonably in view of the probability of injury to the Swidos. Erica knew Mr. Hairford had purchased Mary Mae from Mark and that he had been informed she was not trained to be ridden. She made no representations to the Swidos and was not privy to Mr. Hairford's discussions with them. To appreciate the

9

likelihood of injury to Mrs. Swido, Erica would have had to anticipate that Mr. Hairford would grossly misrepresent Mary Mae's level of training and prompt Mrs. Swido to ride her, even though she was not trained to be ridden. There is no evidence to suggest Erica had any reason to believe that Mr. Hairford would be anything other than honest in his representations of Mary Mae to the Swidos. Further, the evidence establishes that, if the Swidos had known Mary Mae was green-broke, they would not have attempted to ride her or would have taken precautions when doing so. We find Erica's failure to anticipate Mr. Hairford's improbable action of misrepresenting Mary Mae's level of training and endangering the Swidos was reasonable. Consequently, she did not have a duty to warn them not to ride her.

### Res Ipsa Loquitor

The Swidos also argue that the doctrine of *res ipsa loquitor* is applicable. *Res ipsa loquitur* is applicable when the circumstances surrounding an accident are so unusual as to give rise to an inference of negligence or liability on the part of the defendant and that, under such circumstances, the only reasonable and fair conclusion is that the accident resulted from a breach of duty or omission on the part of the defendant. *Cangelosi v. Our Lady of the Lake Reg'l Med. Ctr.*, 564 So.2d 654 (La.1989).

The facts of this case are unusual; however, they do not give rise to an inference of negligence on the part of Mark and Erica. Based on Mr. Swido's testimony, if Mr. Hairford had told them that Mary Mae was green-broke, they would have known she was not ready to be ridden and would not have attempted to ride her. There is no inference of negligence on the part of Mark or Erica.

10

### *Disposition*

For these reasons, we conclude that the Swidos have failed to produce sufficient evidence to establish that they will be able to satisfy their evidentiary burden at trial against these defendants on any of their theories of liability and that there is no genuine issue of material fact. Accordingly, the trial court erred in denying summary judgment in favor of Miki Gaillard, Mark and Erica Gaillard, and Lafayette Insurance Company. Defendants' writ applications are granted; the trial court's denial of summary judgment is reversed; summary judgment is granted in favor of Miki Gaillard, Mark and Erica Gaillard, and Lafayette Insurance Company, and the Swidos' claims against these defendants are dismissed with prejudice. All costs associated with these writ applications are assessed to the Swidos.

**WRITS GRANTED AND MADE PEREMPTORY.**